# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)
MAY 2026 00152
E-Filing Number: 2605001635

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| CHARLES E.. MARTIN III | GERBER PRODUCTS COMPANY |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 163 BLACKMAN ROAD<br>EGG HARBOR TOWNSHIP NJ 08234 | 1812 N. MOORE STREET<br>ARLINGTON VA 22209 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| | NESTLE USA, INC. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| | 1812 N. MOORE STREET<br>ARLINGTON PA 22209 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| | WALMART, INC. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| | 702 S.W. 8TH STREET<br>BENTONVILLE AR 72716 |

TOTAL NUMBER OF PLAINTIFFS: 1

TOTAL NUMBER OF DEFENDANTS: 5

COMMENCEMENT OF ACTION
- ☐ Complaint
- ☐ Petition Action
- ☐ Notice of Appeal
- ☒ Writ of Summons
- ☐ Transfer From Other Jurisdictions

AMOUNT IN CONTROVERSY
- ☐ $50,000.00 or less
- ☒ More than $50,000.00

COURT PROGRAMS
- ☐ Arbitration
- ☒ Jury
- ☐ Non-Jury
- ☐ Other:
- ☐ Mass Tort
- ☐ Savings Action
- ☐ Petition
- ☐ Commerce
- ☐ Minor Court Appeal
- ☐ Statutory Appeals
- ☐ Settlement
- ☐ Minors
- ☐ W/D/Survival

CASE TYPE AND CODE

2P - PRODUCT LIABILITY

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

FILED
PRO PROTHY
MAY 01 2026
L. BREWINGTON

IS CASE SUBJECT TO COORDINATION ORDER?
YES NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: CHARLES E. MARTIN III

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| ROBERT BRENT. WISNER | 11111 SANTA MONICA BLVD<br>STE 1750<br>LOS ANGELES CA 90025 |
| PHONE NUMBER: (310)207-3233 / FAX NUMBER: (310)820-7444 | |
| **SUPREME COURT IDENTIFICATION NO.** | **E-MAIL ADDRESS** |
| 322626 | rbwisner@wisnerbaum.com |
| **SIGNATURE OF FILING ATTORNEY OR PARTY** | **DATE SUBMITTED** |
| *ROBERT WISNER* | Friday, May 01, 2026, 01:27 pm |

**COMPLETE LIST OF DEFENDANTS:**

1. GERBER PRODUCTS COMPANY
   1812 N. MOORE STREET
   ARLINGTON VA 22209
2. NESTLE USA, INC.
   1812 N. MOORE STREET
   ARLINGTON PA 22209
3. WAKEFERN FOOD CORP.
   5000 RIVERSIDE DRIVE
   KEASBEY NJ 08832
4. WALMART, INC.
   702 S.W. 8TH STREET
   BENTONVILLE AR 72716
5. SHOP-RITE SUPERMARKETS, INC.
   5000 RIVERSIDE DRIVE
   KEASBEY NJ 08832

Filed and Attested by the
Office of Judicial Records
01 MAY 2026 01:27 pm
L. BREWINGTON

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

| | |
|---|---|
| Charles E. Martin, III<br>163 Blackman Road<br>Egg Harbor Township, NJ 08234<br><br>*Plaintiff(s) Name(s) & Address(es),*<br><br>v.<br><br>Gerber Products Company<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Nestle USA, Inc.<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Walmart, Inc.<br>702 S.W. 8th Street<br>Bentonville, AR 72716<br><br>Shop-Rite Supermarkets, Inc.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>Wakefern Food Corp.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>*Defendant(s) Name(s) & Address(es),* | PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION<br><br>May Term, 2026<br><br>Case No. |

**PRAECIPE TO ISSUE WRIT OF SUMMONS**

TO THE OFFICE OF JUDICIAL RECORD:

Kindly issue a Writ of Summons in the above captioned civil action.

Dated: May 1, 2026 Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

Summons
Citacion

# Commonwealth of Pennsylvania
COUNTY OF PHILADELPHIA

Charles E. Martin, III
*Plaintiff*

vs.

Gerber Products Company, et al.
*Defendant*

COURT OF COMMON PLEAS
May Term, 20 26

No.________________

To[1]
Gerber Products Company
Nestle USA, Inc.
Walmart, Inc.
Shop-Rite Supermarkets, Inc.
Wakefern Food Corp.

# Writ of Summons

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante*
Charles E. Martin, III

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*

ERIC FEDER
*Director, Office of Judicial Records*

By: ________________________

Date: ________________________

OFFICE OF JUDICIAL RECORDS · FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
260500152
01 MAY 2026 01:27 pm
L. BREWINGTON

10-208 (Rev. 3/20/24)

Case ID: 260500152

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

# Court of Common Pleas

May Term, 20 26

No. ________________

Charles E. Martin, III

*Plaintiff*

vs.

Gerber Products Company, et al.

*Defendant*

# SUMMONS

# CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: May 1, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, R. Brent Wisner, hereby certify this 1st day of May 2026, I filed a true and correct copy of the within *Praecipe to Issue Writ of Summons* via the Court's Electronic Filing System, which service satisfies the requirements of Pennsylvania Rules of Civil Procedure, on all counsel of record and unrepresented parties.

/s/ *R. Brent Wisner*
R. Brent Wisner
*Attorney for Plaintiff*

Filed and Attested by the
Office of Judicial Records
29 MAY 2026 05:29 pm
L. BREWINGTON

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

| | |
|---|---|
| Charles E. Martin, III<br>163 Blackman Road<br>Egg Harbor Township, NJ 08234<br><br>*Plaintiff(s) Name(s) & Address(es),*<br><br>v.<br><br>Gerber Products Company<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Nestle USA, Inc.<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Walmart, Inc.<br>702 S.W. 8th Street<br>Bentonville, AR 72716<br><br>Shop-Rite Supermarkets, Inc.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>Wakefern Food Corp.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>*Defendant(s) Name(s) & Address(es),* | PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION<br><br>May Term, 2026<br><br>Case No. 260500152<br><br>JURY TRIAL DEMANDED |

**PRAECIPE TO RE-ISSUE WRIT OF SUMMONS**

TO THE OFFICE OF JUDICIAL RECORD:

Kindly re-issue a Writ of Summons in the above captioned civil action.

Dated: May 29, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

Summons
Citacion

# Commonwealth of Pennsylvania

COUNTY OF PHILADELPHIA

Charles E. Martin, III
*Plaintiff*

vs.

Gerber Products Company, et al.
*Defendant*

COURT OF COMMON PLEAS

May Term, 20 26

No. 260500152

To[1]
Gerber Products Company
Nestle USA, Inc.
Walmart, Inc.
Shop-Rite Supermarkets, Inc.
Wakefern Food Corp.

# Writ of Summons

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante*

Charles E. Martin, III

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*

ERIC FEDER
*Director, Office of Judicial Records*

By: ______________________

Date: ______________________

OFFICE OF JUDICIAL RECORDS • FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
260500152
09 MAY 2026 05:29 pm
L. BREWINGTON

10-208 (Rev. 3/20/24)

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

# Court of Common Pleas

May Term, 20 26

No. 260500152

Charles E. Martin, III

*Plaintiff*

vs.

Gerber Products Company, et al.

*Defendant*

# SUMMONS

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: May 29, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, R. Brent Wisner, hereby certify this 29st day of May 2026, I filed a true and correct copy of the within *Praecipe to Issue Writ of Summons* via the Court's Electronic Filing System, which service satisfies the requirements of Pennsylvania Rules of Civil Procedure, on all counsel of record and unrepresented parties.

/s/ *R. Brent Wisner*
R. Brent Wisner
*Attorney for Plaintiff*

Filed and Attested by the
Office of Judicial Records
29 JUN 2026 09:12 pm
L. BREWINGTON

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

| | |
|---|---|
| Charles E. Martin, III<br>163 Blackman Road<br>Egg Harbor Township, NJ 08234<br><br>*Plaintiff(s) Name(s) & Address(es),*<br><br>v.<br><br>Gerber Products Company<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Nestle USA, Inc.<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Walmart, Inc.<br>702 S.W. 8th Street<br>Bentonville, AR 72716<br><br>Shop-Rite Supermarkets, Inc.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>Wakefern Food Corp.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>*Defendant(s) Name(s) & Address(es),* | PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION<br><br>May Term, 2026<br><br>Case No. 260500152 |

**PRAECIPE TO ISSUE WRIT OF SUMMONS**

TO THE OFFICE OF JUDICIAL RECORD:

Kindly re-issue a Writ of Summons in the above captioned civil action.

Dated: June 29, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

Summons
Citacion

# Commonwealth of Pennsylvania

COUNTY OF PHILADELPHIA

| | | |
|---|---|---|
| Charles E. Martin, III<br>*Plaintiff* | : | COURT OF COMMON PLEAS |
| | : | May Term, 20 26 |
| vs. | : | |
| Gerber Products Company, et al.<br>*Defendant* | : | No. 260500152 |

To[1]
Gerber Products Company
Nestle USA, Inc.
Walmart, Inc.
Shop-Rite Supermarkets, Inc.
Wakefern Food Corp.

## Writ of Summons

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante*

Charles E. Martin, III

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*

ERIC FEDER
*Director, Office of Judicial Records*

By: ______________________

Date: ______________________

OFFICE OF JUDICIAL RECORDS • FIRST JUDICIAL DISTRICT OF PENNSYLVANIA •
260500152
[illegible]
L. BREWINGTON

Case ID: 260500152

10-208 (Rev. 3/20/24)

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

# Court of Common Pleas

May Term, 20 26

No. 260500152

Charles E. Martin, III

*Plaintiff*

vs.

Gerber Products Company, et al.

*Defendant*

# SUMMONS

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: June 29, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, R. Brent Wisner, hereby certify this 29th day of June 2026, I filed a true and correct copy of the within *Praecipe to Issue Writ of Summons* via the Court's Electronic Filing System, which service satisfies the requirements of Pennsylvania Rules of Civil Procedure, on all counsel of record and unrepresented parties.

/s/ *R. Brent Wisner*
R. Brent Wisner
*Attorney for Plaintiff*

Filed and Attested by the
Office of Judicial Records
28 JUL 2026 09:15 pm
L. BREWINGTON

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

| | |
|---|---|
| Charles E. Martin, III<br>163 Blackman Road<br>Egg Harbor Township, NJ 08234<br><br>*Plaintiff(s) Name(s) & Address(es),*<br><br>v.<br><br>Gerber Products Company<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Nestle USA, Inc.<br>1812 N. Moore Street<br>Arlington, VA 22209<br><br>Walmart, Inc.<br>702 S.W. 8th Street<br>Bentonville, AR 72716<br><br>Shop-Rite Supermarkets, Inc.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>Wakefern Food Corp.<br>5000 Riverside Drive,<br>Keasbey, New Jersey, 08832<br><br>*Defendant(s) Name(s) & Address(es),* | PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION<br><br>May Term, 2026<br><br>Case No. 260500152 |

**PRAECIPE TO ISSUE WRIT OF SUMMONS**

TO THE OFFICE OF JUDICIAL RECORD:

Kindly re-issue a Writ of Summons in the above captioned civil action. Dated: July 28, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

Summons
Citacion

# Commonwealth of Pennsylvania
COUNTY OF PHILADELPHIA

| | | |
|---|---|---|
| Charles E. Martin, III<br>*Plaintiff* | : | COURT OF COMMON PLEAS<br>May Term, 20 26 |
| vs. | : | No. 260500152 |
| Gerber Products Company, et al.<br>*Defendant* | : | |

To[1]
Gerber Products Company
Nestle USA, Inc.
Walmart, Inc.
Shop-Rite Supermarkets, Inc.
Wakefern Food Corp.

## Writ of Summons

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante*

Charles E. Martin, III

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*

ERIC FEDER
*Director, Office of Judicial Records*

By: ____________________

Date: ____________________

OFFICE OF JUDICIAL RECORDS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
260500152
[illegible]
L. BREWINGTON

Case ID: 260500152

10-208 (Rev. 3/20/24)

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

# Court of Common Pleas

May Term, 20 26

No. 260500152

Charles E. Martin, III

*Plaintiff*

vs.

Gerber Products Company, et al.

*Defendant*

# SUMMONS

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: July 28, 2026

Respectfully submitted,

BY: /s/ *R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, R. Brent Wisner, hereby certify this 28th day of July 2026, I filed a true and correct copy of the within *Praecipe to Issue Writ of Summons* via the Court's Electronic Filing System, which service satisfies the requirements of Pennsylvania Rules of Civil Procedure, on all counsel of record and unrepresented parties.

/s/ *R. Brent Wisner*
R. Brent Wisner
*Attorney for Plaintiff*

| | | |
|---|---|---|
| *Attorney or Party without Attorney:*<br>R. Brent Wisner (SBN 335346)<br>WISNER BAUM<br>11111 Santa Monica Boulevard, Suite 1750<br>Los Angeles, CA 90025<br>*Telephone No:* (310) 207-3233<br>*Attorney For:* Plaintiff | *Ref. No. or File No.:*<br>C.M. VS. GERBER(PA) | *For Court Use Only*<br>Filed and Attested by the Office of Judicial Records 16 SEP 2026 03:26 pm L. BREWINGTON |
| *Insert name of Court, and Judicial District and Branch Court:*<br>Commonwealth of Pennsylvania COUNTY OF PHILADELPHIA | | |
| *Plaintiff:* Charles E. Martin, III<br>*Defendant:* Gerber Products Company; ET AL | | |

| PROOF OF SERVICE | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>260500152 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Writ of Summons; Praecipe To Issue Writ Of Summons

3. *a. Party served:* Gerber Products Company
   *b. Person served:* Elias Green, Authorized to Accept Service for The Corporation Trust Company, Agent for Service of Process

4. *Address where the party was served:* 1209 Orange Street, Wilmington, DE 19801

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu, Jul 30 2026 (2) at: 08:30 AM

Recoverable cost Per CCP 1033.5(a)(4)(B)

6. ***Person Who Served Papers:***
   a. Eric Chrisco
   **b. FIRST LEGAL**
   1517 W. Beverly Blvd.
   LOS ANGELES, CA 90026
   c. (213) 250-1111

   **d.** ***The Fee*** *for Service was:* $350.00
   **e.** I am: Not A Registered California Process Server

7. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

07/30/2026
*(Date)*

*(Signature)*

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>R. Brent Wisner (SBN 335346)<br>WISNER BAUM<br>11111 Santa Monica Boulevard, Suite 1750<br>Los Angeles, CA 90025<br>*Telephone No:* (310) 207-3233<br>*Attorney For:* Plaintiff<br>*Ref. No. or File No.:* C.M. VS. GERBER(PA) | *For Court Use Only*<br>Filed and Attested by the Office of Judicial Records 16 SEP 2026 03:26 pm L. BREWINGTON |
| *Insert name of Court, and Judicial District and Branch Court:*<br>PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION | |
| *Plaintiff:* Charles E. Martin, III<br>*Defendant:* Gerber Products Company; ET AL | |

| PROOF OF SERVICE | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* 260500152 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Praecipe To Issue Writ Of Summons; Writ of Summons; Certificate Of Compliance; Certificate Of Service

3. a. *Party served:* Nestle USA, Inc.
   b. *Person served:* Lauren Everett, Authorized to Accept Service for CT Corporation System, Agent for Service of Process

4. *Address where the party was served:* 4701 Cox Road Suite 285, Glen Allen, VA 23060

5. *I served the party:*
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu, Jul 30 2026 (2) at: 02:05 PM

Recoverable cost Per CCP 1033.5(a)(4)(B)

6. *Person Who Served Papers:*
   a. Karen Rice
   b. FIRST LEGAL
      1517 W. Beverly Blvd.
      LOS ANGELES, CA 90026
   c. (213) 250-1111
   d. *The Fee for Service was:* $350.00
   e. I am: Not A Registered California Process Server

7. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

07/30/2026
*(Date)*

Karen L Rice
*(Signature)*

FL FIRSTLEGAL

Judicial Council Form
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF SERVICE

*16485010*
*(17863191)*

| Attorney or Party without Attorney: | | | | For Court Use Only |
|---|---|---|---|---|
| R. Brent Wisner (SBN 335346)<br>WISNER BAUM<br>11111 Santa Monica Boulevard, Suite 1750<br>Los Angeles, CA 90025<br>Telephone No: (310) 207-3233<br>Attorney For: Plaintiff | | Ref. No. or File No.:<br>C.M. VS. GERBER(PA) | | Filed and Attested by the Office of Judicial Records 16 SEP 2026 03:26 pm L. BREWINGTON |
| Insert name of Court, and Judicial District and Branch Court:<br>Commonwealth of Pennsylvania COUNTY OF PHILADELPHIA | | | | |
| Plaintiff: Charles E. Martin, III<br>Defendant: Gerber Products Company; ET AL | | | | |
| **PROOF OF SERVICE** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>260500152 |

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Writ of Summons; Praecipe To Issue Writ Of Summons

3. *a. Party served:* Shop-Rite Supermarkets, Inc.
   *b. Person served:* Daniel Fink, Authorized to Accept Service for Prentice-Hall Corporation System, Inc., Agent for Service of Process

4. *Address where the party was served:* 5235 North Front Street, Harrisburg, PA 17110

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu, Jul 30 2026 (2) at: 10:57 AM

Recoverable cost Per CCP 1033.5(a)(4)(B)

6. ***Person Who Served Papers:***
   a. Richard Hanna
   **b. FIRST LEGAL**
   1517 W. Beverly Blvd.
   LOS ANGELES, CA 90026
   c. (213) 250-1111

   **d.** ***The Fee*** *for Service was:* $350.00
   **e.** I am: Not A Registered California Process Server

7. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

07/30/2026
(Date)

(Signature)

FIRSTLEGAL

Judicial Council Form
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF SERVICE**

*16484966*
*(17863179)*

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>R. Brent Wisner (SBN 335346)<br>WISNER BAUM<br>11111 Santa Monica Boulevard, Suite 1750<br>Los Angeles, CA 90025<br>*Telephone No:* (310) 207-3233<br>*Attorney For:* Plaintiff<br>*Ref. No. or File No.:* C.M. VS. GERBER(PA) | *For Court Use Only*<br>Filed and Attested by the Office of Judicial Records 16 SEP 2026 03:26 pm L. BREWINGTON |
| *Insert name of Court, and Judicial District and Branch Court:*<br>Commonwealth of Pennsylvania COUNTY OF PHILADELPHIA | |
| *Plaintiff:* Charles E. Martin, III<br>*Defendant:* Gerber Products Company; ET AL | |
| **PROOF OF SERVICE** \| *Hearing Date:* \| *Time:* \| *Dept/Div:* | *Case Number:*<br>260500152 |

1. *At the time of service I was at least 18 years of age and not a party to this action.*
2. I served copies of the Praecipe To Issue Writ Of Summons; Writ of Summons; Certificate Of Compliance; Certificate Of Service
3. *a. Party served:* Wakefern Food Corp.
   *b. Person served:* Alison Belsky, Authorized to Accept Service for CT Corporation System, Agent for Service of Process
4. *Address where the party was served:* 820 Bear Tavern Road, West Trenton NJ 08628
5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Tue, Aug 04 2026 (2) at: 01:32 PM

Recoverable cost Per CCP 1033.5(a)(4)(B)

6. ***Person Who Served Papers:***
   a. Aziza Amer
   **b. FIRST LEGAL**
   1517 W. Beverly Blvd.
   LOS ANGELES, CA 90026
   c. (213) 250-1111

   **d.** ***The Fee*** *for Service was:* $350.00
   **e.** I am: Not A Registered California Process Server

7. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

08/05/2026
*(Date)*

*(Signature)*

| | | |
|---|---|---|
| *Attorney or Party without Attorney:*<br>R. Brent Wisner (SBN 335346)<br>WISNER BAUM<br>11111 Santa Monica Boulevard, Suite 1750<br>Los Angeles, CA 90025<br>*Telephone No:* (310) 207-3233<br>*Attorney For:* Plaintiff | *Ref. No. or File No.:*<br>C.M. VS. GERBER(PA) | *For Court Use Only*<br>Filed and Attested by the Office of Judicial Records 16 SEP 2026 03:26 pm L. BREWINGTON |
| *Insert name of Court, and Judicial District and Branch Court:*<br>Commonwealth of Pennsylvania COUNTY OF PHILADELPHIA | | |
| *Plaintiff:* Charles E. Martin, III<br>*Defendant:* Gerber Products Company; ET AL | | |

| PROOF OF SERVICE | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* 260500152 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Writ of Summons; Praecipe To Issue Writ Of Summons

3. a. *Party served:* Walmart, Inc.
   b. *Person served:* Elias Green, Authorized to Accept Service for The Corporation Trust Company, Agent for Service of Process

4. *Address where the party was served:* 1209 Orange Street, Wilmington, DE 19801

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu, Jul 30 2026 (2) at: 08:30 AM

Recoverable cost Per CCP 1033.5(a)(4)(B)

6. ***Person Who Served Papers:***
   a. Eric Chrisco
   **b. FIRST LEGAL**
   1517 W. Beverly Blvd.
   LOS ANGELES, CA 90026
   c. (213) 250-1111

   **d.** ***The Fee** for Service was:* $175.00
   **e.** I am: Not A Registered California Process Server

7. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

07/30/2026
(Date)

(Signature)

Filed and Attested by the
Office of Judicial Records
05 OCT 2026 08:06 pm
S. GILLIAM

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
Katherine F. Pratty (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com
kpratty@wisnerbaum.com

*Attorneys for Plaintiff*

**IN THE COURT OF COMMON PLEAS OF**
**PHILADELPHIA COUNTY, PENNSYLVANIA**

| | |
|---|---|
| CHARLES E. MARTIN, III,<br><br>*Plaintiff,*<br><br>v.<br><br>GERBER PRODUCTS COMPANY; NESTLÉ USA, INC.; WALMART INC.,<br><br>*Defendants.* | COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY — TRIAL DIVISION (CIVIL)<br><br>October Term, 2026<br><br>Case No. 260500152<br><br>JURY TRIAL DEMANDED |

**NOTICE TO DEFEND**

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>*YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.*<br><br>PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL and INFORMATION SERVICE<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>TEL: (215) 238-6333<br>TTY: (215) 451-6197 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>*LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.*<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br>SERVICIO DE REFERENCIA E INFORMACION LEGAL<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>TEL: (215) 238-6333<br>TTY: (215) 451-6197 |

**WISNER BAUM LLP**
R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
Katherine F. Pratty (*to be admitted pro hac vice*)
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com
kpratty@wisnerbaum.com

*Attorneys for Plaintiff*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA**

| | |
|---|---|
| CHARLES E. MARTIN, III,<br><br>*Plaintiff,*<br><br>v.<br><br>GERBER PRODUCTS COMPANY; NESTLÉ USA, INC.; WALMART INC.,<br><br>*Defendants.* | COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY — TRIAL DIVISION (CIVIL)<br><br>October Term, 2026<br><br>Case No. 260500152<br><br>JURY TRIAL DEMANDED |

## COMPLAINT — CIVIL ACTION

Plaintiff Charles E. Martin, III, by and through undersigned counsel, brings this Complaint against Defendants Gerber Products Company, Nestlé USA, Inc., and Walmart Inc. and alleges as follows:

## PRELIMINARY STATEMENT

1. This case involves a group of manufacturers—namely, Gerber Products

Company, Nestlé USA, Inc. and Walmart Inc. ("Defendants", "Defendant Baby Food Manufacturers", or "Manufacturer Defendants")—that *knowingly* sold baby food products ("Baby Foods") which contain dangerous levels of toxic heavy metals—lead and arsenic (collectively "Toxic Heavy Metals"), which are known to be severe neurotoxins—and how such toxic exposures substantially contributed to Plaintiff developing lifelong brain injury. Plaintiff Charles E. Martin, III ("Plaintiff"), is an adult who lives with debilitating brain injury, namely in the form of the neurodevelopmental disorder autism spectrum disorder ("ASD") and related *sequalae* because, as an infant, he consumed poisonous Baby Foods manufactured and sold by these Defendants. This case seeks to hold the Defendant Baby Food Manufacturers accountable for their reprehensible conduct and ensure they are punished for permanently affecting Plaintiff's ability to live a fulfilling life.

2. Defendants' Baby Foods are laced with staggering amounts of Toxic Heavy Metals, which made headlines following research and a Congressional investigation. In February 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform released a report containing shocking details of Defendants' tainted Baby Foods based on the submission of internal test results and company documents. Specifically, the Subcommittee found that Defendants sell Baby Foods containing as much as 180 parts per billion ("ppb")[1] inorganic arsenic, 6441 ppb lead, and 10 ppb mercury and manufacture their Baby Foods using ingredients containing as much as 913.4 ppb arsenic and 886.9 ppb lead, far eclipsing domestic and international regulatory standards. By way of comparison, the U.S. Food and Drug Administration ("FDA") has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the U.S. Environmental Protection Agency ("EPA") has capped the allowable level of mercury in drinking water at 2 ppb. With a chilling note the Subcommittee concluded that "[m]anufacturers *knowingly* sell these

[1] Ppb (or ppbm) is used to measure the concentration of a contaminant in soils, sediments, and water. 1 ppb equals 1 µg (microgram) of substance per kg of solid (µg/kg). For the average baby weighing approximately 3kg, the quantities of Toxic Heavy Metals found in Defendants' Baby Foods, as explained below, pose significant health risks.

products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[2] (emphasis added). Indeed, following the Congressional findings and subsequent public uproar, Defendant Beech-Nut recalled one of its baby food product lines from the market, citing dangerous levels of arsenic in its single grain rice cereal, and exited the rice cereal market altogether.[3]

3. The high levels of Toxic Heavy Metals found in Defendants' Baby Foods are, in part, a function of the ingredients used by Defendants to manufacture their Baby Foods, the setting of dangerously inflated internal limits which Defendants willingly flouted, disregard of regulatory standards, and corporate policies which failed to test finished products before market distribution, purchase by unknowing parents, and consumption by vulnerable infants.

4. Defendants' malicious recklessness and callous disregard for human life has wreaked havoc on the health of countless vulnerable children, all so that Defendants could maximize profits while deliberately misleading parents regarding the safety of their Baby Foods. Accordingly, this lawsuit will not only ensure that Plaintiff is duly compensated for his tragic injuries and Defendants punished, but that future generations are protected from the poisonous products that Defendants pander as "food".

## PARTIES

### I. Plaintiff

5. Plaintiff Charles E. Martin, III is an adult who at all relevant times is domiciled in New Jersey.

6. Plaintiff is a child who lives with brain injuries and neurodevelopmental harm

---

[2] Staff Report, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) ("Subcommittee Report") at 59, available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

[3] FDA, *Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment,* available at: https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and



Case ID: 260500152

caused by exposure to the Defendants' Contaminated Baby Food, which has manifested in a diagnosis of ASD.

7. Plaintiff consumed baby foods manufactured and/or sold by Gerber Products Company, Nestlé USA, Inc., and Walmart Inc.

8. The baby foods manufactured by Defendant Gerber and consumed by Plaintiff were manufactured at the direction of, and/or under the control of, and/or according to the specification of, and/or with input from its parent companies, Nestlé USA, Inc.

9. Plaintiff alleges that as a direct and proximate result of Plaintiff's exposure to Toxic Heavy Metals from consumption of Defendants' Contaminated Baby Foods, they suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, brain injury manifesting as the neurodevelopmental disorder ASD, other permanent physical deficits, permanent bodily impairment, and other *sequelae*. Plaintiff's injuries required medical intervention to address the adverse neurological effects and damage caused by exposure to Toxic Heavy Metals in Defendants' Contaminated Baby Foods. Additionally, Plaintiff has suffered severe mental and physical pain, including but not limited to, pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress and has and will sustain such injuries, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes, into the future, as determined by the Trier of Fact.

10. The product warnings for the Contaminated Baby Foods in effect during the time period Plaintiff consumed the Contaminated Baby Foods were non-existent, vague, incomplete and/or otherwise inadequate, both substantively and graphically, to alert consumers to the presence of Toxic Heavy Metals in the Contaminated Baby Foods and/or the potentially severe health risks associated with Toxic Heavy Metal exposure in babies. Thus, each Defendant did not provide adequate warnings to consumers including Plaintiff, and the general public about the presence of Toxic Heavy Metals in the Contaminated Baby Foods consumed by Plaintiffs and the potential risk of the serious adverse events associated with Toxic Heavy Metal exposure in

infancy.

11. Had Plaintiff been adequately warned by the Defendants of the potential for exposure to Toxic Heavy Metals from consumption of Defendants' Baby Foods, and/or the potential for such exposure to result in harm, Plaintiff, would not have purchased, used and/or consumed Contaminated Baby Foods or would have taken other steps to potentially mitigate the harm caused by exposing a baby to Toxic Heavy Metals.

## II. Defendants

12. The following are the Defendants listed in this Complaint. In alphabetical order:

1. Gerber Products Company ("Gerber")
2. Nestlé USA, Inc. ("Nestlé USA")
3. Walmart, Inc. ("Walmart")

14. **Defendant Gerber Products Company ("Gerber")** is a corporation organized under the laws of the State of Michigan with its principal place of business at 1812 N. Moore Street, Arlington, Virginia 22209, and may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Gerber sells Baby Foods under the Gerber brand. At all relevant times, Gerber conducted business and derived substantial revenue from the manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the Commonwealth of Pennsylvania, including in Philadelphia County. The Pennsylvania Department of Health WIC Food List and shopping guide identifies Gerber among approved infant-food brands.[4] Accordingly, Gerber's Baby Foods have been deliberately made available for purchase and consumption by Pennsylvania infants through retail channels within the Commonwealth.

15. **Defendant Nestlé USA, Inc. ("Nestlé USA")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 1812 N. Moore Street, Arlington, Virginia 22209, and may be served through its registered agent, CT Corporation

[4] Pennsylvania Department of Health, *Pennsylvania WIC Food List* (2026) available at https://wic.health.pa.gov/pawic/documents/FoodLists/WIC%20Food%20List%20English.pdf.



Case ID: 260500152

System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060. Nestlé USA is the parent company of Gerber and, at all relevant times, was a decision-maker regarding the safety of Gerber Baby Foods and ingredients, including the amount of Toxic Heavy Metals in those foods, and was responsible for testing Gerber's Baby Food products for heavy metals. At all relevant times, Nestlé USA conducted business and derived substantial revenue from the manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the Commonwealth of Pennsylvania, including in Philadelphia County.

Allegations directed at Gerber apply equally to Nestlé USA (collectively with Gerber, the "Nestlé Defendants").

16. **Defendant Walmart Inc. ("Walmart")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas 72716, and may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Walmart sells Baby Foods under its private-label brand "Parent's Choice," which is manufactured by co-manufacturers but branded, promoted, and sold as a Walmart product. At all relevant times, Walmart conducted business and derived substantial revenue from the manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the Commonwealth of Pennsylvania, including in Philadelphia County.

17.

## JURISDICTION AND VENUE

18. Plaintiff incorporates by reference all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

19. This Court has subject matter jurisdiction over this action pursuant to Article V, § 5 of the Pennsylvania Constitution and 42 Pa.C.S.A. § 931, which confer unlimited original jurisdiction on the Courts of Common Pleas over civil actions unless otherwise provided by law.

20. This Court has general personal jurisdiction over each Defendant that is incorporated in, has qualified as a foreign corporation to do business in, or otherwise consented

to jurisdiction in Pennsylvania, and over each Defendant that carries on a continuous and systematic part of its general business within the Commonwealth, pursuant to 42 Pa. C.S.A. § 5301.

21. This Court also has specific personal jurisdiction over each Defendant because the claims asserted herein arise from and relate to Defendants' contacts with the Commonwealth of Pennsylvania, and the exercise of personal jurisdiction over Defendants comports with the constitutional requirements of due process, fair play, and substantial justice.

22. This Court has specific personal jurisdiction over each Defendant pursuant to Pennsylvania's long-arm statute, 42 Pa. C.S.A. § 5322(a) and (b), because each Defendant transacted business within the Commonwealth, shipped merchandise directly or indirectly into or through the Commonwealth, and caused harm within the Commonwealth by acts or omissions occurring within and without the Commonwealth.

23. Venue is proper in Philadelphia County pursuant to Pa.R.Civ.P. 1006 and 2179 because one or more Defendants regularly conducts business in Philadelphia County, and because the transactions and occurrences giving rise to Plaintiff's causes of action — including the marketing, distribution, and sale of the Baby Foods — took place, in part, in Philadelphia County. Pursuant to Pa.R.Civ.P. 1006(c), because this action is properly brought against one Defendant in Philadelphia County, venue is proper as to all Defendants.

24. Plaintiff seeks relief within the jurisdictional limits of this Court.

## FACTUAL ALLEGATIONS

### Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods

25. In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing "outcomes-based programs to measurably reduce babies' exposures to toxic chemicals"[5],

[5] https://www.hbbf.org/solutions.

published a report investigating the presence of Toxic Heavy Metals in baby foods.[6] The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury. All but nine of 168 baby foods contained at least one metal; most contained more than one."[7] Specifically, the HBBF report identified "puffs and other snacks made with rice flour", "[t]eething biscuits and rice rusks", "infant rice cereal", "apple, pear, grape and other fruit juices", and "carrots and sweet potatoes" manufactured by the Defendant Baby Food Companies as particularly high in Toxic Heavy Metals.[8]

26. The results of the HBBF report were consistent with that of the FDA which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.[9] However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."[10] The HBBF's findings were by no means an outlier. Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead…concentrations in a large convenience sample of US baby foods."[11] The study detected lead in 37% of samples.[12] This was consistent with findings by researchers examining baby food products in other parts of the world.

---

[6] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).
[7] *Id*. at 6.
[8] *Id*. at 10-11
[9] *Id*. at 6.
[10] *Id*. at 6.
[11] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at: https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub.
[12] *Id*.

27. Moreover, earlier in 2017, HBBF commissioned a study to evaluate the presence of arsenic in infant rice cereal products sold in the U.S., and the potential risks to children's neurodevelopment posed by contamination levels. The findings were concerning. The authors concluded that "exposures to arsenic from infant rice cereal approach or exceed existing health-based limits for arsenic levels…leaving little room for additional exposures from other dietary sources, such as snacks, apple juice, and drinking water…Our analyses of arsenic exposures from infant rice cereal during the first year of life suggest that these exposures are not insignificant, and may place infants at risk for adverse health effects."

### A. Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Sparking National Outrage

28. On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including lead, arsenic, and mercury—were present in "significant levels" in numerous commercial baby food products.[13] Four companies—Hain, Gerber, Nurture, and Beech-Nut—produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits. Three companies—Plum, Walmart, and Sprout—refused to cooperate.[14]

29. Congress reported that the data submitted by the companies unequivocally revealed that a substantial number of Defendants' finished products and/or ingredients used to manufacture the Baby Foods are tainted with Toxic Heavy Metals, namely lead, arsenic, mercury, and cadmium. And, where the Defendants did set internal limits for the amount of

---

[13] *See generally* Subcommittee Rpt.
[14] Subcommittee Rpt. at 2.



Case ID: 260500152

metals they allowed in their foods, Defendants routinely flouted their own limits and sold foods that consistently tested above their limits. Congress found the following:

30. **Beech-Nut.** Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness." On June 8, 2021, four months following the Congressional findings, Beech-Nut issued a voluntary recall of its infant single grain rice cereal and exited the rice cereal market completely. In its recall, Beech-Nut confirmed that its products exceed regulatory arsenic limits. And, Beech-Nut used ingredients containing as much as 886.9 ppb lead, as well as 483 products that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead. In its follow up Report in September 2021, Congress specifically focused on Defendants Beech-Nut and Gerber's infant rice cereals. Congress noted that Beech-Nut rice cereal tested up to 125 ppb inorganic arsenic and averaged 85.47 ppb inorganic arsenic. Beech-Nut's practice of testing ingredients, rather than finished products, for toxic heavy metals appears to have contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products. Lastly, Beech-Nut does not even test for mercury in baby food.

31. **Gerber.** Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic. Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead. Gerber rarely tests for mercury in baby foods. In the September 2021 follow-up Congressional report, it was revealed that Gerber's rice cereal tested up to 116 ppb inorganic arsenic, and their average rice cereal product contained 87.43 ppb inorganic arsenic, which is even higher than the amount contained in Beech-Nut's average rice cereal product. While Beech-Nut recalled some of its products and

completely discontinued sales of its rice cereal, Gerber and other Nestlé entities have taken no such actions to protect children.

32. **Hain (Earth's Best Organic).** Hain sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic. Hain used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead. And, Hain does not even test for mercury in its baby food. However, independent testing by HBBF of Hain's Baby Foods confirms that Hain's products contain as much as 2.4 ppb of mercury.

33. **Nurture (HappyBABY).** Submissions from Danone North America showed that Nurture sold baby foods after tests showed they contained as much as 180 ppb inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic. Nurture sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead. Moreover, Nurture sold finished baby food products containing as much as 10 ppb mercury.

34. **Plum.** Plum, along with Campbell, refused to cooperate with the Congressional investigation. Instead of producing any substantive information, Campbell provided Congress with a self-serving spreadsheet declaring that every one of its products sold through Plum "meets criteria", while declining to state what those criteria were. Disturbingly, Campbell admitted that, for mercury (a powerful neurotoxin), Campbell and Plum have *no criterion* whatsoever, stating: "No specific threshold established because no high-risk ingredients are used." However, despite Campbell and Plum having no mercury threshold, Campbell and Plum still marked every food as

"meets criteria" for mercury. Congress noted that "[t]his misleading framing—of meeting criteria that do not exist—raises questions about what [Plum's] other thresholds actually are, and whether they exist." This suspicion is confirmed by HBBF's independent testing which confirms the presence of Toxic Heavy Metals in Plum Baby Food, which found excess levels of lead, arsenic, and mercury in Plum's Just Sweet Potato Organic Baby Foods; Just Peaches Organic Baby Food; Just Prune Organic Baby Food; Pumpkin Banana Papaya Cardamom; Apple, Raisin & Quiona Organic Baby Food; Little Teethers Organic Multigrain Teething Wafers-Banana with Pumpkin; and Mighty Morning Bar-Blueberry Lemon-Tots. Furthermore, as discussed further below, based upon information and belief, Plaintiffs submit that Campbell and Plum's pattern and practice of failing to test ingredients, willingly flouting their own internal standards, and selling products notwithstanding internal acknowledgement of their high metal content, follows that of the other Defendants discussed in this Complaint, and discovery here will further flesh out the extent of Campbell and Plum's culpable conduct.

35. **Sprout.** Sprout initially refused to cooperate with the House Subcommittee's investigation, and as such the Subcommittee stated that Sprout's failure to respond "raises serious concerns about the presence of toxic heavy metals in its baby foods." The Subcommittee noted that independent data from the HBBF Report confirmed that Sprout's baby foods are indeed tainted. For example, the HBBF Report observed that Sprout's Organic Quiona Puffs Baby Cereal Snack-Apple Kale contained 107 ppb total arsenic, 47 ppb inorganic arsenic, 39.3 ppb lead, and 41.5 ppb cadmium.

36. As outlined in the Subcommittee's Addendum Report, Sprout eventually provided a "handful of documents" to the Subcommittee, and the documents provided "displayed a lax approach to testing for toxic heavy metals in its baby food." Sprout relies on its ingredients



Case ID: 260500152

suppliers to test their ingredients for toxic heavy metals and only asks the suppliers to test once a year. Upon information and belief, despite its representations to the Subcommittee, Sprout did not require its raw ingredient suppliers to provide yearly heavy metal test results prior to the Subcommittee's inquiry into the company. Sprout provided only 11 toxic heavy metal test results to the Subcommittee stating that "[b]ecause Sprout requires annual testing for heavy metals for its ingredients, rather than by lot, Sprout is unable to provide testing information for each lot as requested." The Subcommittee called this testing the "the most reckless among baby food sellers on the market."

37. **Walmart**. Walmart refused to cooperate with the House Subcommittee's investigation into its baby foods products, and as such, the Subcommittee was "greatly concerned" that Walmart "might be obscuring the presence of higher levels of toxic metals in their baby food products." The Subcommittee noted that independent data from the HBBF Report confirmed that Walmart's baby foods are indeed tainted. For example, the HBBF Report observed that one of Walmart's products contained 56.1 ppb total arsenic, and 26.1 ppb cadmium. Another product contained 108 ppb total arsenic, 66 ppb inorganic arsenic, 26.9 ppb lead, and 2.05 ppb mercury.

38. Following the publication of the Subcommittee Report, Walmart provided documents to the Subcommittee. On September 29, 2021, the House Subcommittee released a subsequent report entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods." The Subcommittee report addendum described the documents from Walmart as "revealing a concerning lack of attention to toxic heavy metal levels in baby food and an abandonment of its previously more protective standards." Walmart does not appear to conduct any testing of its baby food products. Walmart sets maximum arsenic and lead levels

and asks the manufacturer of its private label to self-certify, but Walmart does not appear to collect any test data or check the accuracy of those certifications. Walmart does not require any mercury or cadmium testing and does not set any standards for mercury or cadmium levels.

39. The metal concentrations discussed above and further below surpass the limits allowed by U.S. regulatory agencies. There are no FDA final regulations governing the presence of Toxic Heavy Metals in the majority of Baby Foods with the exception of 100 ppb inorganic arsenic in infant rice cereal and some recently finalized limits for lead in certain baby food categories. To the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendants' Baby Foods exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to *adult* exposure, not infants. Compared to these thresholds, the test results of the Defendants' baby foods and their ingredients are multiple folds greater than the permitted metal levels. They are also far greater than permitted by the FDA's final guidance for lead, issued January 6, 2025, which sets limits at 10 or 20 ppb for baby foods (10 ppb for fruits, 10 ppb for single or mixed vegetable purees/puddings, 20 ppb for single ingredient root vegetables, and 20 ppb for dry cereals) and 10 or 20 ppb for juices (10 ppb for apple juice or single-strength juice and 20 ppb for juice blends containing apple juice), and the FDA's proposed limit for arsenic in apple juice (10 ppb). Moreover, compounding these troubling findings, the Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below.

40. As Congress observed, the Defendants have willfully sold—and continue to



Case ID: 260500152

sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products.

## III. Defendants Engaged in a Pattern and Practice of Selling Contaminated Baby Foods and Failed to Reduce Metal Levels Dangers of Toxic Heavy Metals to Babies and Children

41. Several factors drive the Toxic Heavy Metal contamination of Defendants' baby foods, all of which are within Defendants' control.

42. *First*, at various times, all Defendants sourced ingredients that contained elevated levels of Toxic Heavy Metals. These ingredients were then used to manufacture the baby foods consumed by Plaintiffs, thereby exposing Plaintiffs to Toxic Heavy Metals that cause brain damage and other neurodevelopmental harm. One way for Defendants to "deal" with this issue involved relegating any testing of Toxic Heavy Metals to suppliers and co-manufacturers, who were required to certify that Toxic Heavy Metals were below a certain threshold. Defendants would audit those results, discover that the reported certifications were false or inaccurate, and then take no action to stop the use of those ingredients or finished products.

43. *Second*, some Defendants implemented dangerously high internal limits ("specifications" or "specs") for the maximum level of Toxic Heavy Metals that Defendants allowed in the baby foods. Such high limits—untethered to any consideration of the low levels at which metals are capable of damaging babies' brains—allowed Defendants to source and use ingredients that contained elevated Toxic Heavy Metals to manufacture the baby foods consumed by Plaintiffs. In the highly competitive and lucrative baby food market, using contaminated ingredients allows each Defendant to retain greater market share.

44. *Third*, some Defendants failed to implement *any* internal specifications for the amount of Toxic Heavy Metals allowed in ingredients or finished baby foods. By simply not



Case ID: 260500152

looking at the issue, certain highly contaminated ingredients and finished products were allowed to be used and sold to consumers. This would happen notwithstanding the Defendants' specific knowledge of the risk of Toxic Heavy Metals and their presence in ingredients and finished products.

45. *Fourth,* Defendants did not routinely adhere to their own internal metal specifications or standards, allowing contaminated ingredients and finished products to be released as "exceptional releases" or other simpler terminology. This resulted in ingredients being used and baby foods manufactured and sold that contained levels of Toxic Heavy Metals far higher than what was internally set by Defendants. In other instances, Defendants would test products that had been put on the market after-the-fact, learn about the products containing extremely high levels of Toxic Heavy Metals, and then take no action to recall the product or warn consumers about the issue.

46. *Fifth*, upon information and belief, Defendants' manufacturing practices also contributed to contamination. For example, the water used at some of the facilities where the baby foods were manufactured contained Toxic Heavy Metals which, in turn, ended up in the finished baby food product sold for consumption by babies.

47. **Beech-Nut**. Beech-Nut and responsible entities did not test their finished baby foods for heavy metals, only ingredients. And, Beech-Nut regularly accepted ingredients testing far higher than its internal limits for Toxic Heavy Metals. It justified such deviations as "exceptional releases." For example, Beech-Nut "exceptionally released" 160,000 pounds of sweet potatoes for its baby food products notwithstanding the ingredient testing twice as high as Beech-Nut's internal heavy metal limit for lead.

48. Moreover, Beech-Nut did not adequately test ingredients for heavy metals by



Case ID: 260500152

limiting ingredient lots and ingredient quantities that were subject to metal testing. For example, if a supplier supplied ingredients below a certain amount, Beech-Nut would not test anything and simply use the ingredient in the finished product. Furthermore, in deciding to violate their own internal limits, Beech-Nut took advantage of the fact that the FDA does not routinely test baby foods for Toxic Heavy Metals.

49. Upon information and belief, Beech-Nut went so far as to manipulate testing practices by continually re-testing ingredients that tested above internal specs until obtaining a result that was at or below the internal specs, knowing full well that the ingredient was nonetheless contaminated.

50. Beech-Nut's internal specifications varied wildly by ingredient, with Beech-Nut allowing very high levels of Toxic Heavy Metals for certain ingredients, and insisting on lower levels for others. Thus, certain products like rice flour, were allowed to have very high levels of metals like arsenic and lead, even in products that were 90% or more rice. Beech-Nut did this because there were no regulations governing Toxic Heavy Metal in baby food and, therefore, to remain competitive in the baby food marketplace, Beech-Nut used contaminated ingredients because they were readily available.

51. **Gerber.** Gerber and Nestlé entities tested ingredients and, occasionally, finished products. However, while Gerber and Nestlé entities were the only Defendants to test both ingredients and finished products with any regularity, they set high heavy metal limits that rendered their food unsafe. For baby foods generally, between 2012 and 2019, Gerber and Nestlé entities set a limit of 40 ppb for lead, 20 ppb for arsenic, and 10 ppb for mercury. For infant rice cereal, between 2012 and 2017, Gerber and Nestlé entities set a lead limit of 100 ppb, with a "target" of 50 ppb in 2016 and 2017. Between 2018 and 2019, Gerber and Nestlé entities



Case ID: 260500152

set a lead limit for 50 ppb. For arsenic in rice cereal, between 2012 and 2015, Gerber and Nestlé entities did not have a limit, merely a target of 100 ppb. Then, between 2016 and 2018, it set the arsenic limit at 100 ppb. By 2019, Gerber and Nestlé entities increased the arsenic limit to 130 ppb for cereals with 90% rice (and kept the limit at 100 ppb for other cereals). For snack foods, Gerber and Nestlé entities had a lead limit of 150 ppb between 2012 and 2014. It was reduced to 100 ppb in 2016 and 2017, and then went down to 50 ppb in 2018 and 2019. There was no limit for arsenic in snack food prior 2016, just a "target" of 100 ppb. Then a 100-ppb arsenic limit was set starting in 2016. For both infant cereal and snacks, Gerber and Nestlé entities imposed a 30-ppb limit for mercury in infant cereal between 2012 and 2016, and reduced it to 10 ppb from 2017 onward. With these exceptionally high limits, Gerber and Nestlé entities sold baby foods that were dangerous for infant consumption. They did this knowingly.

52. Gerber and Nestlé entities would also audit and re-test Toxic Heavy Metal results submitted by suppliers, and find that the certification from suppliers were incorrect or false. Gerber and Nestlé entities would nonetheless use the certified results and release products despite the ingredients not meeting specifications or being safe for infant consumption.

53. Gerber and Nestlé entities often used high-arsenic ingredients, for example, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic. Furthermore, Gerber and Nestlé entities regularly sold baby food products testing over 100 ppb arsenic, at times reaching 116 ppb, and their average rice cereal product contained 87.43 ppb inorganic arsenic. Indeed, this is why Congress noted that "Gerber's organic rice cereal is dangerous…" In other instances, Gerber permitted as much as 300 ppb of arsenic in the rice flour ingredient used to manufacture its U.S. baby foods, notwithstanding the fact that Gerber often implemented stricter standards for baby foods sold in other countries.



Case ID: 260500152

54. Gerber's baby foods are also contaminated with elevated levels of lead. Gerber and Nestlé entities used ingredients that tested as high as 48 ppb lead and used many ingredients containing over 20 ppb lead. Furthermore, Gerber and Nestlé entities sold baby food products testing at and/or above 50 ppb of lead. Indeed, Gerber and Nestlé entities have historically permitted as much as 150 ppb lead in their baby food products. Although Gerber and Nestlé entities were fully aware that it was very feasible to source lower-lead ingredients, they proceeded to use high-lead ingredients in their baby foods. Gerber and Nestlé entities rarely test for mercury in their baby foods. This is notwithstanding the fact that mercury is known to contaminate ingredients such as rice and poses a severe risk to babies' brain development.

55. The February 4, 2021 Congressional Report found Gerber carrots tested for cadmium at levels above 5 ppb, with some containing more than 87 ppb of cadmium. These are exceptionally high levels.

56. Moreover, compounding these troubling findings, Gerber and Nestlé entities historically only tested certain ingredients of its baby food products and only occasionally tested the finished products consumed by babies. It was not until recently that Gerber and Nestlé entities started to implement finished product testing on a more regular basis.

57. Gerber and Nestlé entities have known since at least the 1990s that inorganic arsenic was neurotoxic and caused developmental issues. Despite this knowledge, in 2012, when Gerber's infant rice cereal was on the front page of a Consumer Report article on arsenic, a Gerber spokesperson told the public that arsenic in baby food posed no health risk.

58. **Hain.** Hain did not test its baby food products for heavy metals until 2020 (rice cereal) and 2021 (other baby food). Instead, Hain tested some ingredients used in their foods (but not all ingredients). Ingredients were required to meet specific specifications for each specific



Case ID: 260500152

ingredient. Those specifications, however, would change wildly without explanation. For example, prior to August 2014, Hain's lead specification for Oat Flour was 200 ppb. Then it was reduced to 50 ppb for four months, went back up to 100 ppb for three months, went back up to 200 ppb for a month, came down to 20 ppb for seven months, went to 25 ppb for six months, and then went back to 200 ppb for the next fourteen months. When asked about this seemingly chaotic shifting of specifications, Hain could not explain it.

59. Hain would routinely accept ingredients that tested above specifications and use them in baby foods anyway. These "exceptional" releases were made because there were no FDA regulations specifically preventing them.

60. Because Hain only tested ingredients, and not finished products, they would underestimate metal exposure. For example, in August 2019, the FDA did what Hain had refused: it actually tested Hain's baby food products for heavy metals. FDA sampled Hain's rice cereal and found levels in excess of 100 ppb. FDA tested 20 of Hain's rice cereal products (all manufactured by Beech-Nut for Hain) sold between September 2017 and June 2018, and found 9 samples in excess of 100 ppb of inorganic arsenic, and 16 (80%) above 90 ppb. The FDA raised concern about Hain's failure to test finished product, and asked Hain to conduct an investigation. These concerns about Hain's rice cereal were independently confirmed by HBBF, where they found 113 and 107 ppb of inorganic arsenic (138 and 126 ppb of arsenic) in those same products. As a result of the FDA ordered investigation, Hain learned that its rice cereal exceeded FDA arsenic levels because Hain never accounted for the arsenic added to the product from the vitamin premix. Hain discovered that the vitamin premix specification was 3,000 ppb for arsenic and 4,000 ppb for lead. They realized that their products needed to be tested in finished form to actually estimate the levels of heavy metals in their foods. Hain also realized that the use of

brown rice was contributing to the high levels of arsenic, so, thereafter, they started using white rice (as opposed to brown rice) to reduce arsenic levels and began testing rice cereal regularly.

61. Hain's inept process of monitoring the safety of their baby foods resulted in products being sold that contained Toxic Heavy Metals, and this was done with full knowledge of the risks. When asked why Hain did not warn consumers of the Toxic Heavy Metals in their foods, Hain responded that if they warned, people would not buy their products.

62. **Nurture.** Since 2006, Defendant Nurture, under the name Happy Family Organics, has sold a wide variety of baby food products. It was not until 2013—seven years after sales began— and after the Danone acquisition, that Nurture and Danone entities started testing its finished baby food products for lead. This testing, however, remained infrequent and occurred only after the products had been released to the public—not as a condition of product release. Indeed, as of July of 2021, Nurture was still not testing every batch or lot of its baby food products for heavy metals and was not including heavy metal testing as a condition of release.

63. Nurture and Danone entities took a lackadaisical approach to sourcing oversight. For example, Nurture and Danone entities partnered with co-manufacturer companies to make many of their baby food products, a common practice within the industry. However, Nurture and Danone entities did not always require those co-manufacturers to provide information regarding the farms where ingredients were grown. Although Nurture and Danone entities advertise to consumers that they have "Farmer Partners" who they "trust to grow our ingredients," Nurture and Danone entities did not even participate in selecting the farms from which co-manufacturers sourced their ingredients. As a result, Nurture and Danone entities do not even know all of the individual farms that grow their food, making it impossible to ensure that all of their ingredients were sourced from approved farms. To make matters worse, they chose not to require all of their



Case ID: 260500152

suppliers to have specifications addressing limits for heavy metals in acceptable products. This practice all but ensured that Nurture and Danone entities would never have a fully accurate picture of the levels of heavy metals in their ingredients or whether there were particular farms or regions that should be avoided.

64. And yet, all the while, Nurture and Danone entities knew that toxic heavy metals in their baby food could cause brain damage in children. Not only did Nurture and Danone entities know of the dangers heavy metals in their food posed to children, they also trained their employees on that specific risk. For example, Nurture and Danone entities knew that dangerous levels of arsenic existed in the rice that served as the base for many of its baby food products. Despite this knowledge, Nurture never removed rice from its products.

65. But in full view of this knowledge and with full understanding of their lackadaisical ingredient oversight approach, Nurture and Danone entities chose to rarely test their finished products for toxic heavy metals. And when they did test their products, they sold them regardless of what the tests showed. For example, Danone entities and Nurture sold baby foods after tests showed they contained as much as 180 ppb inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic. Danone entities and Nurture sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead. Moreover, Danone entities and Nurture sold finished baby food products containing as much as 10 ppb mercury. But Nurture never issued a recall for these products. Indeed, nothing indicates that Nurture made any changes to its policies or approaches toward heavy metals monitoring to

ensure that baby food with this level of heavy metal contamination was not released to the public.

66. The guiding light for Nurture and Danone entities' choices was always money. They chose their infrequent testing and lack of heavy metal specifications policies based on cost. They chose not to inform parents of the presence of heavy metals in their foods because they knew parents would then not purchase their products. They capitalized on the term "organic" that featured prominently on their labels, knowingly exploiting consumers' widespread confusion that "organic" means free of heavy metals. And, they implemented policies of refusing to provide testing results of their products to consumers, even when parents asked, because they knew the effect such information would have on their sales.

67. **Plum.** Plum was founded in 2007 and has sold a wide variety of baby food products under the name Plum Organics since that time. Plum was owned and controlled by Campbell from June 2013 until roughly May 2021 when Plum was sold to Sun-Maid.

68. Despite Plum's public facing statements that "little ones deserve the very best food from the very first bite" and despite understanding that environmental toxins like heavy metals can cause neurodevelopmental disorders in children, Plum and Campbell/Sun-Maid did very little to ensure that the Plum baby food products marketed for consumption by children are not contaminated with dangerous levels of heavy metals. For example, though Plum and Campbell/Sun-Maid knew that the heavy metal contents of the ingredients used in its products varied by growing region and supplier, they did not undertake an effort to source ingredients with the lowest amount of heavy metals available. And, despite knowing that certain ingredients carry a higher risk for heavy metal contamination, Plum and Campbell/Sun-Maid did not reformulate their products to ensure that they were being made with the lowest achievable



Case ID: 260500152

amount of heavy metals.

69. Plum and Campbell failed to set limits on the amount of heavy metals that could be present in Plum's finished baby food products. From 2007 to at least April 2021, they did not set *any* limits for the amount of lead, arsenic, mercury, cadmium, or aluminum that their finished products could contain.

70. Plum and Campbell also failed to set limits on the amount of heavy metals that could be present in the ingredients used in Plum's baby food products. Prior to 2016, they did not set limits for the amount of heavy metals that could be present in the ingredients used in Plum products. When Plum and Campbell did begin to implement heavy metal limits for Plum ingredients (in or around 2017), it did so only for lead, arsenic, and cadmium. As of April 2021, Plum and Campbell still had no limits for the amount of mercury and aluminum that could be in the ingredients used in their baby food products.

71. When Plum did set some heavy metal limits (for lead and arsenic for ingredients only) it set those limits several times in excess of what was achievable for most ingredients. For example, despite certain fruits and vegetables normally containing less than 5 ppb lead or arsenic, Plum set the heavy metal limits for all Plum ingredients for lead and arsenic at 100 ppb. And, even still, despite setting these limits dangerously high, Plum and Campbell/Sun-Maid still utilized ingredients that tested in excess of those limits.

72. Plum and Campbell/Sun-Maid also conducted very little oversight of their co-manufacturers to ensure that the heavy metal limits for ingredients used in Plum products were adhered to. For example, prior to 2017, Plum and Campbell did not require the ingredient suppliers they contracted with to submit heavy metal testing data but instead relied on supplier assurances that the ingredients did not contain heavy metals and/or complied with all

government regulations regarding heavy metals. When Plum and Campbell/Sun-Maid did begin to require testing on some of the ingredients used in its products for lead and arsenic, those efforts were scattershot and did not extend to all lots of all ingredients used in Plum baby food products. Where verification testing was conducted on ingredients, it was often done in an unaccredited lab.

73. Despite not having a comprehensive ingredient testing program to ensure that Plum food marketed for babies was not contaminated with Toxic Heavy Metals, Plum and Campbell/Sun-Maid also did not conduct heavy metal testing on Plum products prior to sale. Plum only first conducted finished product testing in the wake of public reports that exposed Plum baby food products as being contaminated with dangerous levels of heavy metals. Upon information and belief, no rigorous heavy metal testing program on ingredients and finished product was ever implemented and Plum and Campbell/Sun-Maid continued and continue to sell baby food contaminated with elevated levels of heavy metals without first testing to ensure their safety.

74. **Sprout.** Sprout's baby foods are contaminated with Toxic Heavy Metals. For example, the HBBF Report observed that Sprout's Organic Quiona Puffs Baby Cereal Snack-Apple Kale contained 107 ppb total arsenic, 47 ppb inorganic arsenic, 39.3 ppb lead, and 41.5 ppb cadmium. These levels are all highly dangerous for consumption by an infant.

75. Sprout's testing and oversight are extremely lacking. Sprout claims that it relies on its ingredients suppliers to test their ingredients for some Toxic Heavy Metals and only asks the suppliers to test once a year—a frequency that cannot ensure any safety. However, upon information and belief, despite its representations, Sprout did not require its raw ingredient suppliers to provide yearly heavy metal test results prior to the Subcommittee's inquiry into the



Case ID: 260500152

company.

76. Sprout provided only 11 toxic heavy metal test results to the Subcommittee stating that "[b]ecause Sprout requires annual testing for heavy metals for its ingredients, rather than by lot, Sprout is unable to provide testing information for each lot as requested." The Subcommittee called this testing the "the most reckless among baby food sellers on the market."

77. Since it began testing in 2021, the results observed in Sprout's food are disturbing. For example, testing showed, on average, over 300 ppb of arsenic in Sprout's puff products, with levels as high as 470 ppb. Testing on other Toxic Heavy Metals also shows exceptionally high levels in various Sprout products. Sprout's consistent failure to test, regulate, or monitor their baby food products, has led to the sale of an alarming number of baby food products that were contaminated with Toxic Heavy Metals.

78. Internal documents within Sprout confirm that the companies were aware of these issues, even made jokes about it, but took no action to take reasonable care to avoid harm to infants until Congress blew the whistle on Sprout—and then, only after Sprout initially refused to cooperate with a Congressional investigation.

79. Despite these findings, Sprout continues to market its products as safe, stating on its website, "[i]f it isn't safe, healthy, and delicious, we don't make it." Considering they never tested their products prior to 2021, this statement is, at best, an overstatement.

80. **Walmart.** Walmart sold baby food under a "private" brand called "Parent's Choice", which was manufactured by a different supplier but branded, promoted, and sold as a Walmart product. Walmart did not test it for Toxic Heavy Metals whatsoever. Instead, Walmart required certain specifications be met for the products provided by its suppliers, which included some limits of heavy metals. These specifications were not enforced in any way. Walmart did



Case ID: 260500152

not require the submission of testing from suppliers, nor did it do any of its own testing.

81. The only efforts to police Toxic Heavy Metals in their Parent's Choice baby food involved generic specifications for lead and arsenic—there were no other specifications or limits for other Toxic Heavy Metals—which for most baby food products resulted in there being no limits. The following chart reflects Walmart's Toxic Heavy Metal specifications prior to December 2018.

| **Type of Food** | **Lead** | **Arsenic** | **Mercury** | **Cadmium** | **Aluminum** |
|---|---|---|---|---|---|
| Dry baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Dry baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Wet baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Wet baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Yogurt baby food products | *None* | *None* | *None* | *None* | *None* |

82. In December 2018, Walmart changed its specification to 100 ppb of inorganic arsenic for all dry baby foods, making the products even less safe. Thus, for the vast majority of Walmart's baby food products, there was never a limit for any Toxic Heavy Metals.

## IV. <u>Defendants Abandon Efforts to Reduce Metal Levels in Baby Foods</u>

83. In 2019, as concerns grew over contamination of certain baby foods on the U.S. market, a consortium of the Defendants comprised of Beech-Nut, Plum/Campbell, Gerber, Hain, Nurture, and Sprout, as well as certain interested third party groups such as the Environmental Defense Fund ("EDF") and HBBF, were formed with the intention "of reducing heavy metals in young children's food."

84. The consortium was named the Baby Food Council ("BFC"). The BFC involved the sharing of common testing data on the levels of metal contamination of Defendants' baby foods, a grant to Cornell University to further study the issue, and a proposed "voluntary Baby



Case ID: 260500152

Food Standard to limit the amounts of heavy metals in baby food." The BFC specifically recognized the risk of neurodevelopmental harm caused by Toxic Heavy Metals to the developing brain of infants and that there were no safe levels of exposure.

85. The Baby Food Standard "would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products."

86. After several years of negotiations and discussions, including a proposed system for testing, the EDF and HBBF proposed voluntary limits of 1 ppb for lead. The baby food companies, however, rejected the proposal outright. Participation in the BFC was little more than a façade—they had no intention of self-regulating their products as it related to Toxic Heavy Metals.

87. This led EDF and HBBF to leave the BFC in protest in 2021. They explained their departure publicly, noting that Defendants "all decided to backpedal on this project—even though the standard was designed to protect babies' brain development" and provide adequate notice to consumers regarding the presence of Toxic Heavy Metals on Baby Food labeling. EDF explained:

> EDF cofounded the Council because we believed there was a shared commitment to reduce levels of lead, arsenic and cadmium in baby food products to better protect children's developing brains from these toxins … Unfortunately, the companies chose to cease the Council's development of a voluntary Baby Food Standard that it had begun in late 2020. The Standard would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products. Negotiations failed to provide an alternative approach that EDF felt was sufficient to drive down levels of lead, arsenic and cadmium in baby food."

88. HBBF explained:



Case ID: 260500152

> Healthy Babies Bright Futures is focused on tangibly reducing neurotoxic exposures to babies. The baby food companies' refusal to jointly set limits for heavy metals in baby food has shown that the Council will no longer be the powerful mechanism for this important work that the initial plans had promised. The baby food companies' decision to stop progress on a voluntary standard for heavy metals in baby food is a disappointment … What started as dedication has turned into delay and intention has become inaction. So HBBF has decided to put our effort into other initiatives that will move the needle on this important issue.

89. In short, the Defendants opted to continue "self-regulating," the same self-regulation which exposed—and continued to expose—Plaintiffs to Toxic Heavy Metals in Defendants' baby foods.

## V. <u>The Dangers of Toxic Heavy Metals and Metal Exposure Through Consumption of Baby Foods</u>

90. According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically lead, arsenic, mercury, and cadmium pose a "major public health concern" for children. The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard." Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number *one* among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).

91. The threat presented by Toxic Heavy Metals to children's health is widely shared by the global regulatory and scientific community. For example, the FDA has set an Interim Reference Level ("IRL") of 2.2 micrograms/day for lead exposure through baby food products. That is the amount of lead exposure at or above which the agency considers associated with adverse neurodevelopmental effects in babies. The FDA, in its guidance documents for inorganic arsenic and lead in baby food products has repeatedly acknowledged the dangers of



Case ID: 260500152

heavy metals to the neurodevelopment of infants:

> Even low lead exposure can harm children's health and development, specifically the brain and nervous system. Neurological effects of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Lead exposures also may be associated with immunological, cardiovascular, renal, and reproductive and/or developmental effects…Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time…Even though no safe level of lead exposure has yet been identified for children's health, the IRL serves as a useful benchmark in evaluating the potential for adverse effects of dietary lead. In particular, FDA is focused on the potential for neurodevelopmental effects from lead exposure, as review of the scientific literature indicates that *such adverse effects of lead consistently occur at a blood lead level associated with FDA's IRL for children*. (emphasis added).

92. As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases. Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence." Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.

93. The mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults. For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in



Case ID: 260500152

vulnerable infants."

94. Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth." In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

## VI. Exposure to Toxic Heavy Metals Has Been Consistently Associated with Neurodevelopmental Harm, i.e., Autism and ADHD in Pediatric Populations

95. It is well-known that exposure to Toxic Heavy Metals in early life can interfere with neurodevelopment at exceedingly low levels of exposure. And, one of the ways in which such interference with neurodevelopment can present in a child is in the form of the neurodevelopmental disorders ASD and ADHD. As the U.S. Centers for Disease Control observed in its 2020 Toxicological Profile for Lead, at just ≤10 µg/dL: "The following neurobehavioral effects in children have been associated with [lead]: "Altered mood and behaviors that may contribute to learning deficits, including *attention deficits, hyperactivity*, *autistic behaviors*, conduct disorders, and delinquency." (emphasis added). Likewise, the NIH states: "prenatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."

96. Such conclusions have likewise been reached by a consortium of the country's leading epidemiologists, pediatricians, and medical groups, noting that Toxic Heavy Metals such as lead and mercury are "prime examples of toxic chemicals that can contribute to learning, behavioral, or intellectual impairment, as well as specific neurodevelopmental disorders such as ADHD or autism spectrum disorder."

97. Multiple studies, reviews, and meta-analyses conducted throughout various parts of the world over the last decade have consistently observed that early life exposure to heavy

metals can cause brain injury and, specifically, brain injury which manifests as ASD.

98. For example, four meta-analyses published in 2014, 2017, 2019 and 2020, respectively, observed consistent associations between exposure to arsenic, cadmium, and mercury and ASD in children; with the authors in all three studies recommending – based on the data – that exposure to such metals in children be reduced as much as possible, and one of the study authors specifically concluding that "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."

99. In a recent 2017 NIH-funded prospective observational study, the authors examined the risk of ASD outcome in twins based on their respective body burden of lead. The study concluded in no uncertain terms that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD, and suggests a role for elemental dysregulation in the etiology of ASD."

100. Similarly, a large, prospective study from 2016 in Korean school children observed that low levels of lead exposure in early life are associated with autism, the authors specifically concluding: "even low blood lead concentrations…are associated with more autistic behaviors… underscoring the need for continued efforts to reduce lead exposure."

101. Studies have repeatedly observed strong associations between exposure to cadmium and aluminum and neurodevelopmental disorders such as ASD, as observed by a recent study: "Environmental exposure to…cadmium (Cd)… and aluminum (Al) has been associated with neurodevelopmental disorders including autism spectrum disorder (ASD)." For example, a study from 2014 evaluated the body burden of lead, cadmium, and arsenic in children with autism compared to controls and noted that, in addition to lead and arsenic, "our study demonstrated elevation in the levels of…cadmium…in a child with autism," while an earlier



Case ID: 260500152

study noted that "autism may be associated with significant alterations of some rare element concentrations, including Cd…" Such results have been confirmed by meta-analyses which "show *significant associations* between ASD and the metals Al [and] Cd." And, such earlier data is further supported by recent research, with a 2023 systematic review and meta-analysis concluding that "compared with the healthy control group, the ASD group had higher concentrations of Cd, Pb, arsenic, and Hg. These 4 heavy metals play different roles in the occurrence and progression of ASD."

102. Repeated associations between early life Toxic Heavy Metal exposure and ASD have also been observed during the pre-natal timeframe, lending further strength to the findings of post-natal studies. For example, in a 2021 study by Skogheim and colleagues, the authors prospectively assessed the relationship between pre-natal metal exposure in various biomarkers and autism risk. The study concluded that "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD and ADHD in children. The most notable ones involved arsenic…mercury…and lead. Our results suggest that even population levels of these compounds may have negative impacts on neurodevelopment."

103. Similarly, in a study by the research group assessing the New Hampshire Birth Cohort, the authors evaluated the neurotoxic effects of heavy metals during various stages of pregnancy and concluded: "Our results support the hypothesis that exposure to…As in mid to late pregnancy may be neurodevelopmentally harmful."

104. Such results have been replicated in studies throughout the world, including China, Korea, the U.S., Europe, and Egypt, implicating arsenic, mercury, and lead in pediatric diagnoses of autism and autistic behaviors, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for

heavy metal exposure, particularly mercury, in the etiology of ASD." Indeed, a 2015 Egyptian study noted "[e]nvironmental exposure to these toxic heavy metals, *at key times in development*, may play a ***causal*** role in autism." (emphasis added).

105. Exposure to Toxic Heavy Metals, specifically lead, has also been repeatedly associated with the development of ADHD in children, as demonstrated by numerous studies.

106. No fewer than four large meta-analyses, conducted in four different continents (North America, South America, Europe and Asia), and some employing a cross-sectional design, have observed a consistent association between various metals and ADHD in children. Indeed, the authors of the meta-analysis from Spain noted that "the evidence from the studies allowed us to establish that there is an association between lead and ADHD and that even *low levels of lead raise the risk*." (emphasis added).

107. The findings from the meta-analyses have been replicated in several Chinese studies from 2006, 2014, and 2018, respectively. Notably, the authors of the 2014 Chinese study observed that "[e]xposure to lead even at low levels correlates with attention-deficit/hyperactivity disorder (ADHD). However, lead-contaminated environments are often *contaminated with other heavy metals that could exacerbate lead-induced ADHD*." (emphasis added). This is particularly relevant—and disturbing—as children who consumed Defendants' baby foods were repeatedly exposed to a cocktail of Toxic Heavy Metals that, synergistically, further increased their risk of developing ADHD.

108. Moreover, studies have observed a dose-response relationship between exposure to Toxic Heavy Metals and ADHD, as demonstrated by the 2016 Spanish study Donzelli, *et al.* Another 2016 cross-sectional study from Spain was conducted on 261 children aged 6-9 to examine the association between exposure to arsenic and ADHD. After adjusting for potential



Case ID: 260500152

confounders, the authors observed a dose-response relationship between urine arsenic levels and inattention and impulsivity scores, concluding that "[urine arsenic] levels were associated with impaired attention/cognitive function, *even at levels considered safe*. These results provide additional evidence that postnatal arsenic exposure impairs neurological function in children." (emphasis added).

109. The fact that such results, and many more, have been observed in multiple studies, conducted by different researchers, at different times, in different parts of the world, in children of multiple ages, utilizing different study methods (prospective, case-control and cross-sectional epidemiological analyses) and measuring a variety of end-points (including hair, blood, and urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of ASD and ADHD in children.

## B. **Defendants' Baby Foods Contain Toxic Heavy Metals Capable of Interfering with Early Neurodevelopment**

110. As illustrated above, Toxic Heavy Metal exposure is capable of inflicting damage to the developing brain at extremely low doses. And, upon information and belief, Defendants manufactured and sold baby foods containing Toxic Heavy Metals that can, under certain circumstances (based upon the genetic susceptibilities, medical history, and other factors of the exposed child) interfere with a baby's neurodevelopment sufficient to cause conditions such as ASD and ADHD.

111. As an initial matter, the study commissioned by HBBF and discussed above specifically evaluated the propensity for arsenic exposure through consumption of infant rice cereal to impact early life neurodevelopment. Following analyses of the levels of arsenic exposure from consumption of infant rice cereal, the authors concluded "that high consumers of infant rice cereal (i.e., infants eating three servings per day) eating products currently on the U.S.

market would have a daily arsenic intake of 0.35-0.67 µg/kg bw/day…per the Tsuji et al. (2015) lower-bound estimate for an RfD for the neurodevelopmental effects of arsenic (0.4 µg/kg bw/day), high consumers of infant rice cereal may also be at risk for this endpoint. Even in average consumers of infant rice cereal (i.e., one serving per day), our estimates of arsenic intakes (0.15 to 0.29 µg/kg bw/day) leave little room for exposures to arsenic from other sources." Thus, consumption of Defendants' baby foods, including but not limited to infant rice cereal and rice-based snack baby food products manufactured and sold by Defendants can expose babies to levels of arsenic above that associated with neurodevelopmental harm in the scientific literature.

112. Defendants manufactured and sold baby food products that, with just a couple of servings, are capable of exposing a baby to lead levels at or above the 2.2 ug/day considered by the FDA to be associated with neurodevelopmental harm. Each source of lead exposure is cumulative—making any detectable amount of Toxic Heavy Metal in baby food a contributing factor to potential neurodevelopmental harm.

113. Similarly, upon information and belief, Defendants were aware of the neurotoxic propensities of lead, arsenic, and mercury at low levels, but proceeded to manufacture and sell Baby Foods containing arsenic and lead levels that, upon information and belief, Defendants considered as capable of inflicting neurodevelopmental harm.

## VII. Defendants Knowingly Sold Baby Foods Containing Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children and Thus Breeched their Duty of Care in Selling Contaminated Baby Foods

114. During the time that Defendants manufactured and sold baby foods in the United States, the weight of evidence showed that Defendants' baby foods exposed babies and children to Toxic Heavy Metals. Defendants failed to disclose this risk to consumers through any means.



Case ID: 260500152

115. As discussed above, both independent testing, the Defendants' internal evaluations of their baby foods, and the Defendants' representations and disclosures to Congress and the FDA reveal the presence of Toxic Heavy Metals in Defendants' products. As such, Defendants knew or should have known that their baby foods contain Toxic Heavy Metals with an attendant risk of causing neurodevelopmental harm.

116. Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market, and the HBBF Report further confirmed such contamination of Defendants' baby foods. And, as the Congressional investigation found, the Defendants continued to sell their baby foods even after testing of both ingredients and finished products revealed the presence of Toxic Heavy Metals.

117. Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers and sellers of baby foods, are held to the standard of experts and responsible for keeping abreast of the latest scientific developments related are held to the dangers of contaminants in their products. Defendants failed to take action to protect vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of brain injury which can manifest as neurodevelopmental disorders such as ASD, ADHD, and related *sequalae*.

118. To be clear, the Defendants are able to manufacture baby foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals or sampling their ingredients from other sources. At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of Toxic Heavy Metals in their Baby Foods. However,

Defendants took no action, continued to sell their products with full knowledge of the risks posed by their Baby Foods, and misled consumers regarding the safety of their products, all to the harm of children.

## VIII. Exemplary / Punitive Damages Allegations (Against Manufacturer Defendants)

119. Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants' conduct is particularly reprehensible given that their toxic foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

120. Defendants were fully aware of the safety risks of Contaminated Baby Foods, particularly the dangerous potential of Toxic Heavy Metals on neurodevelopment in infants and children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their baby foods as safe for consumption and go so far as claiming that they adhere to "the strictest standards in the world;" and provide "baby's food full of nutrition while meeting standards strict enough for tiny tummies," as well as other statements and representations that hold out their baby foods as safe for consumption by infants. Indeed, each Defendant falsely reassured parents/guardians/caregivers that their baby foods would foster healthy neurodevelopment when consumed even though they knew their baby foods exposed infants' developing brains to potent neurotoxic heavy metals. In actual fact, as discussed above, Defendants routinely sold Contaminated Baby Foods, regularly flouted their own internal limits of Toxic Heavy Metals and failed to disclose to consumers that their products contained such dangerous contaminants.

121. This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their Baby Foods were

harmless to humans, and that full disclosure of the true risks of the Toxic Heavy Metals present in the Baby Foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, failure to test, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Parents were denied the right to make an informed decision about whether to purchase and Defendants' Baby Food for their children, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

122. Accordingly, Plaintiff requests punitive damages against the Manufacturer Defendants for the harms caused to Plaintiff.

## PLAINTIFF-SPECIFIC ALLEGATIONS

123. Plaintiff was diagnosed with ASD at approximately 12 years of age.

124. Plaintiff started consuming Baby Food products manufactured and/or sold by the Defendants in approximately 2006 and consumed Defendants' Baby Food products at various times through early childhood.

125. Plaintiff consumed substantial quantities of the Baby Food products manufactured by Defendants.

126. Plaintiff has not finished his investigation of the case. Accordingly, the Baby Foods identified below may not be exhaustive of the products manufactured by Defendants and consumed by Plaintiff.

127. **Gerber**: Plaintiff is currently gathering product information.

128. Upon information and belief, the Baby Food products manufactured/marketed by Gerber and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic – exceeding that of any regulatory limits.

129. Upon information and belief, as a direct and proximate result of consuming



Case ID: 260500152

Gerber's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

130. As a direct and proximate result of consuming Gerber's Baby Foods – and the exposure to the Toxic Heavy Metals therein – Plaintiff suffered brain injury that manifested as ASD and related *sequalae*.

131. **Walmart**: Plaintiff is currently gathering product information.

132. Upon information and belief, the Baby Food products manufactured/marketed by Gerber and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely lead and arsenic – exceeding that of any regulatory limits.

133. Upon information and belief, as a direct and proximate result of consuming Gerber's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely lead and arsenic.

134. As a direct and proximate result of consuming Gerber's Baby Foods – and the exposure to the Toxic Heavy Metals therein – Plaintiff suffered brain injury that manifested as ASD and related *sequalae*.

135. Based on prevailing scientific evidence, exposure to the Toxic Heavy Metals at the levels contained in Defendants' Baby Foods can cause brain injury which can manifest as the neurodevelopmental disorders ASD and related *sequalae* in humans.

136. Had any Defendant warned Plaintiff's parents that Defendants' Baby Foods could lead to exposure to Toxic Heavy Metals or, in turn, brain injury, Plaintiff would not have consumed the Baby Foods.

137. Plaintiff alleges that as a direct and proximate result of Plaintiff's consumption of Baby Foods supplied and distributed by Defendants, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to brain injury which manifested as ASD and related *sequelae*.

## LIMITATION ON ALLEGATIONS



Case ID: 260500152

138. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

139. The allegations in this pleading are made pursuant to state law. To the extent state law imposes a duty or obligation on the Defendants that exceeds those required by federal law, Plaintiff does not assert such claims.

140. Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under state law, notwithstanding that such claims run parallel to federal law.

## CAUSES OF ACTION

### Count I: Strict Products Liability – Failure to Warn

### (Against Manufacturer Defendants)

141. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

142. At all relevant times, the Manufacturer Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting Baby Foods, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Baby Foods and Toxic Heavy Metals. These actions were under the ultimate control and supervision of the Manufacturer Defendants. At all relevant times, the Manufacturer Defendants registered, researched, manufactured, distributed, marketed, and sold Baby Foods and aimed at a consumer market.

143. The Manufacturer Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Baby Foods, and in the course of same, directly

advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the consumption of Baby Foods.

144. At all relevant times, the Manufacturer Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. The Manufacturer Defendants had a continuing duty to warn Plaintiff of dangers associated with Baby Foods. The Manufacturer Defendants, as a manufacturer, seller, or distributor of food, are held to the knowledge of an expert in the field.

145. At the time of manufacture, the Manufacturer Defendants could have provided the warnings or instructions regarding the full and complete risks of Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

146. At all relevant times, the Manufacturer Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Baby Foods.

147. Even though the Manufacturer Defendants knew or should have known that Baby Foods posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they

distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff. The product warnings for Baby Foods in effect during the time period Plaintiff consumed Baby Foods were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Baby Foods consumption.

148. The Manufacturer Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and the Manufacturer Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, of the risks of exposure to their products. The Manufacturer Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of Toxic Heavy Metals in their Baby Foods and the potential for consumed Baby Foods to expose children to Toxic Heavy Metals, and further, have made false and/or misleading statements concerning the safety of Baby Foods.

149. At all relevant times, Defendants' Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

150. Plaintiff was exposed to Defendants' Baby Foods without knowledge of their dangerous characteristics.

151. At all relevant times, Plaintiff was exposed to Defendants' Baby Foods while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

152. Plaintiff could not have reasonably discovered the defects and risks associated

with Baby Foods prior to or at the time of Plaintiff consuming Baby Foods. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

153. Defendants knew or should have known that the information disseminated with their Baby Foods were inadequate, failed to communicate adequate information on the dangers of consumption, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

154. The information that the Manufacturer Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid consuming the products. Instead, the Manufacturer Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of consuming Baby Foods.

155. This alleged failure to warn is not limited to the information contained on Baby Foods labeling. The Manufacturer Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Baby Foods through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium. The ability to provide such warnings is not prohibited by any federal law.

156. Furthermore, the Manufacturer Defendants possess a First Amendment Right to make truthful statements about the products they sell, and no law could lawfully restrict that constitutional right.

157. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products. However, as a result of Defendants' concealment of the dangers posed by their Baby Foods, Plaintiff could not have averted his injuries.

158. The Manufacturer Defendants' conduct, as described above, was reckless. Defendants risked the lives of babies and children, including Plaintiff, with knowledge of the safety problems associated with Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

159. The Defendants' lack of adequate warnings and instructions accompanying their Baby Foods were a substantial factor in causing Plaintiff's injuries.

160. As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

161. **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor and against the Manufacturer Defendants, jointly and severally, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**Count II: Strict Products Liability – Design Defect**

**(Against Manufacturer Defendants)**

162. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

163. At all times herein mentioned, the Manufacturer Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff. These actions were under the ultimate control and supervision of the Manufacturer Defendants.

164. At all relevant times, the Manufacturer Defendants' Baby Food products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to infants and babies, including Plaintiff.

165. The Manufacturer Defendants' Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by the Manufacturer Defendants were defective in design and formulation in that, when they were placed into the stream of commerce, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

166. The Manufacturer Defendants' Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants', the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

167. At all relevant times, the Baby Food products consumed by Plaintiff was expected to and did reach Plaintiff without a substantial change in its condition as manufactured, handled,

distributed, and sold by the Manufacturer Defendants.

168. At all relevant times, the Manufacturer Defendants knew or had reason to know that their Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by the Manufacturer Defendants.

169. Therefore, at all relevant times, the Manufacturer Defendants' Baby Food products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by the Manufacturer Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, the Manufacturer Defendants' Baby Food products were unreasonably dangerous in that they were hazardous and posed a grave risk of causing brain injury that manifests as the neurodevelopmental disorders ASD, ADHD and related *sequalae* when used in a reasonably anticipated manner due to the substantial quantities of Toxic Heavy Metals in the Baby Foods;

b. When placed in the stream of commerce, the Manufacturer Defendants' Baby Food products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner; the Manufacturer Defendants did not sufficiently test, investigate, or study their Baby Food products; Exposure to the Toxic Heavy Metals in Defendants' Baby Food products present a risk of harmful effects that outweigh any potential utility stemming from their use; the Manufacturer Defendants knew or should have known at the time of marketing Baby Food products that exposure to their Baby Food products could result in brain injury that



Case ID: 260500152

manifests as ASD, ADHD, and related *sequalae* in children;

c. the Manufacturer Defendants did not conduct adequate post-marketing surveillance of their Baby Food products; and

d. the Manufacturer Defendants could have employed safer alternative designs and formulations.

170. Plaintiff consumed the Manufacturer Defendants' Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

171. The Manufacturer Defendants' Baby Food products were and are more dangerous than alternative products, and the Manufacturer Defendants could have designed their Baby Food products to avoid harm to children. Indeed, at the time the Manufacturer Defendants designed the Baby Food products, the state of the industry's scientific knowledge was such that less risky design or formulation was attainable.

172. At the time the Baby Food products left the Manufacturer Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the Manufacturer Defendants' Baby Foods, as for example, demonstrated by Hain's presentation to the FDA wherein Hain acknowledges the risk posed by specific ingredients in its Baby Foods.

173. The Manufacturer Defendants have intentionally and recklessly defectively designed the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

174. The design defects in the Manufacturer Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

175. As a direct and proximate result of the Manufacturer Defendants' defective design of the Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**Count III: Strict Products Liability – Manufacturing Defect**

(**Against Manufacturer Defendants**)

176. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

177. At all times herein mentioned, the Manufacturer Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff.

178. At all relevant times, the Baby Foods consumed by Plaintiff was expected to and did reach Plaintiff without a substantial change in its condition as manufactured, handled, distributed, and sold by the Manufacturer Defendants.

179. At all relevant times, the Baby Foods consumed by Plaintiff was used in a manner that was foreseeable and intended by the Manufacturer Defendants.

180. The Baby Foods consumed by Plaintiff was not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that the Manufacturer Defendants deviated materially from their design and manufacturing specifications and/or such design and manufacture posed an unreasonable risk of harm to Plaintiff.

181. The Defendants' Baby Foods are inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable uses, and do not meet or perform to the expectations of parents or children.

182. The Baby Foods create risks to the health and safety of babies that are far more significant and devastating than the risks posed by other baby food products, and which far outweigh the utility of the Baby Foods products because of the Manufacturer Defendants' manufacturing defects, which included but were not limited to: Failure to adequately inspect/test the Baby Foods during the manufacturing process; Failure to implement procedures that would reduce or eliminate the levels of Toxic Heavy Metals in Baby Foods; Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture Baby Foods.

183. The Manufacturer Defendants have intentionally and recklessly manufactured the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

184. The manufacturing defects in the Manufacturer Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

185. As a direct and proximate result of the Manufacturer Defendants' defective manufacture of the Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**Count IV: Negligence – Failure to Warn**

**(Against Manufacturer Defendants)**

186. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

187. At all relevant times, the Manufacturer Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Baby Foods. The Manufacturer Defendants knew or by the exercise of reasonable care should have known that their Baby Foods are not accompanied with adequate warnings concerning the dangerous characteristics of Baby Foods and Toxic Heavy Metals. These actions were under the ultimate control and supervision of Defendants.

188. The Manufacturer Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Baby Foods.

189. At all relevant times, the Manufacturer Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. The Manufacturer Defendants had a continuing duty to warn Plaintiff of dangers associated with Baby Foods. The Manufacturer Defendants, as a manufacturer, seller, or distributor of food products, are held to the knowledge of an expert in the field.

190. At the time of manufacture, the Manufacturer Defendants could have provided

warnings regarding the full and complete risks of Baby Foods and Toxic Heavy Metals because they knew or should have known use of Baby Foods was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

191. At all relevant times, the Manufacturer Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by the Manufacturer Defendants' Baby Foods.

192. The Manufacturer Defendants knew or should have known that Baby Foods posed a grave risk of harm, but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the characteristics of Toxic Heavy Metals contained in substantial amounts in their Baby Foods, as described above, were known to the Manufacturer Defendants, or scientifically knowable to the Manufacturer Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as the Plaintiff.

193. The Manufacturer Defendants further breached their duty by failing to use reasonable care to adequately warn or instruct consumers (*i.e.*, the reasonably foreseeable users) of the risks of exposure to their products. The Manufacturer Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of Toxic Heavy Metals in their Baby Foods and the potential for consumed Baby Foods to expose babies and toddlers to Toxic Heavy Metals, and further, have made false and/or misleading statements concerning the safety of Baby Foods.

194. At all relevant times, Plaintiff was exposed to excessive levels of Toxic Heavy



Case ID: 260500152

Metals through consumption of Toxic Heavy Metals while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

195. The Manufacturer Defendants knew or should have known that the minimal warnings disseminated with their Baby Foods were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

196. The information that the Manufacturer Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid using the product. Instead, the Manufacturer Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Baby Foods; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of consuming Baby Foods.

197. A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of Baby Foods and Toxic Heavy Metals contained therein.

198. This alleged failure to warn is not limited to the information contained on the labeling of the Manufacturer Defendants' Baby Foods. The Manufacturer Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Baby Foods and Toxic Heavy Metals through other non-labeling mediums, *i.e.*,

promotion, advertisements, public service announcements, and/or public information sources. But the Manufacturer Defendants did not disclose these known risks through any medium.

199. Furthermore, the Manufacturer Defendants possess a First Amendment Right to make truthful statements about the products they sell, and no law could lawfully restrict that constitutional right.

200. Had the Manufacturer Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products. However, as a result of the Manufacturer Defendants' concealment of the dangers posed by their Baby Foods, Plaintiff could not have averted his injuries.

201. The Manufacturer Defendants' conduct, as described above, was reckless. The Manufacturer Defendants risked the lives of consumers and users of their products, including Plaintiff, with knowledge of the safety problems associated with Baby Foods, and suppressed this knowledge from the general public. The Manufacturer Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. The Manufacturer Defendants' reckless conduct warrants an award of punitive damages.

202. The Manufacturer Defendants' lack of adequate warnings and instructions accompanying their Baby Foods were a substantial factor in causing Plaintiff's injuries.

203. As a direct and proximate result of the Manufacturer Defendants' failure to provide an adequate warning of the risks of Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

204. **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**Count V: Negligent Product Design**

(**Against Manufacturer Defendants**)

205. The Manufacturer Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Baby Foods.

206. The Manufacturer Defendants owed a duty to all reasonably foreseeable users to design a safe product.

207. The Manufacturer Defendants breached their duty by failing to use reasonable care in the design of Baby Foods because the product exposed users to unsafe levels of Toxic Heavy Metals.

208. The Defendants breached their duty by failing to use reasonable care in the design of Baby Foods by negligently designing the Baby Foods with ingredients and/or components high in Toxic Heavy Metals.

209. The Manufacturer Defendants breached their duty by failing to use reasonable care in the design of Baby Foods by negligently designing and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, the Manufacturer Defendants' Baby

Foods were unreasonably dangerous in that they were hazardous and posed a grave risk of neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, the Manufacturer Defendants' Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. The Manufacturer Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products;

e. The Manufacturer Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the ability for Baby Foods to expose babies to high amounts of Toxic Heavy Metals;

f. Exposure to Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

g. The Manufacturer Defendants knew or should have known at the time of marketing Baby Foods that exposure to Toxic Heavy Metals contained in the Baby Foods could result in brain injury that manifests as ASD, ADHD and other severe illnesses and injuries;

h. The Manufacturer Defendants did not conduct adequate post-marketing surveillance of their Baby Foods; and

i. The Manufacturer Defendants could have employed safer alternative designs and formulations. For example, the Manufacturer Defendants could have avoided use of certain ingredients high in Toxic Heavy Metals, avoided using

pre-mix vitamins high in Toxic Heavy Metals, and/or sampled their ingredients from other sources.

210. The Manufacturer Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs. There was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the Manufacturer Defendants' Baby Foods.

211. A reasonable company under the same or similar circumstances would have designed a safer product.

212. Plaintiff was harmed directly and proximately by the Manufacturer Defendants' failure to use reasonable care in the design of their Baby Foods. Such harm includes significant exposure to a Toxic Heavy Metals, which can cause or contribute to brain injury that manifests as ASD, ADHD, and related *sequalae*.

213. The Manufacturer Defendants' defective design of Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of consumers of the Baby Foods, including Plaintiff.

214. The defects in the Manufacturer Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

215. As a direct and proximate result of the Manufacturer Defendants' defective design of the Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

216. **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in

Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**Count VI: Negligent Manufacturing**

(**Against Manufacturer Defendants**)

217. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

218. At all relevant times, the Manufacturer Defendants manufactured, tested, marketed, sold, and distributed the Baby Foods that Plaintiff consumed.

219. The Manufacturer Defendants had a duty to exercise reasonable care, in the manufacturing, testing, marketing, sale, and distribution of Baby Foods.

220. The Manufacturer Defendants knew or, by the exercise of reasonable care, should have known, use of Baby Foods were carelessly manufactured, dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

221. The Manufacturer Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Baby Foods improperly manufactured, tested, marketed, distributed, and sold.

222. Without limitation, examples of the manner in which Manufacturer Defendants breached their duty to exercise reasonable care in manufacturing Baby Foods, included:

a. Failure to adequately inspect/test the Baby Foods during the manufacturing process;

b. Failure to implement procedures that would reduce or eliminate levels of Toxic Heavy Metals in Baby Foods; and

c. Failure to avoid using ingredients free from, or which contain far less,



Case ID: 260500152

Toxic Heavy Metals to manufacture Baby Foods.

223. A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality and safety of their product.

224. Plaintiff was harmed directly and proximately by the Manufacturer Defendants' failure to use reasonable care in the manufacture of their Baby Foods. Such harm includes significant exposure to a Toxic Heavy Metals, which can cause or contribute to brain injury which manifests as ASD, ADHD, and related *sequalae*.

225. The Manufacturer Defendants' improper manufacturing of Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Baby Foods, including Plaintiff.

226. The defects in the Manufacturer Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

227. As a direct and proximate result of the Manufacturer Defendants' improper manufacturing of Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

228. **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

229. **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.



Case ID: 260500152

## PRAYER FOR RELIEF

230. **WHEREFORE**, Plaintiff requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

a. Compensatory damages in an amount to be determined at trial and in excess of the applicable compulsory arbitration limits, for Plaintiff's past and future physical injury, pain and suffering, disability, impairment, loss of enjoyment of life, medical and related expenses, and lost or impaired earning capacity;

b. Punitive and exemplary damages against the Manufacturer Defendants sufficient to punish and deter them and others from future wrongful conduct;

c. Pre-judgment and post-judgment interest;

d. Costs of suit; and

e. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

231. Plaintiff respectfully demands a trial by jury on all of the triable issues within this pleading.

Dated: October 5, 2026 Respectfully submitted,

BY: */s/ R. Brent Wisner*

R. Brent Wisner (ID No.: 335346)
Monique A. Alarcon (*to be admitted pro hac vice*)
Pedram Esfandiary (*to be admitted pro hac vice*)
Katherine Pratty (*to be admitted pro hac vice*)
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
(310) 207-3233
rbwisner@wisnerbaum.com
malarcon@wisnerbaum.com
pesfandiary@wisnerbaum.com

kpratty@wisnerbaum.com

*Attorneys for Plaintiff*



Case ID: 260500152

**VERIFICATION**

I, R. Brent Wisner, hereby state that I am counsel for Plaintiff in this action and I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that the statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

October 5, 2026

*/s/ R. Brent Wisner*
R. Brent Wisner

**CERTIFICATION OF COMPLIANCE WITH CASE RECORDS PUBLIC ACCESS POLICY**

I, R. Brent Wisner, certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than nonconfidential information and documents.

Dated: October 5, 2026

*/s/ R. Brent Wisner*
R. Brent Wisner
Pa. Bar ID #: 335346
*Attorneys for Plaintiff*

# Court of Common Pleas - Civil

# Civil Docket Report

No Items in Cart Log In

A $5 Convenience fee will be added to the transaction at checkout.

< New Search

## Case Description

| | |
|---|---|
| **Case ID:** | 260500152 |
| **Case Caption:** | MARTIN VS GERBER PRODUCTS COMPANY ETAL |
| **Filing Date:** | Friday , May 01st, 2026 |
| **Court:** | MAJOR JURY-COMPLEX |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | PRODUCT LIABILITY |
| **Status:** | LISTED FOR CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| CASE MANAGEMENT CONFERENCE | 30-NOV-2026 08:00 AM | REVIEW OF RECORD ONLY BY CMC | NO CONFERENCE | *unassigned* |

## Case Motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | WISNER, ROBERT BRENT |
| **Address:** | 11111 SANTA MONICA BLVD<br>STE 1750<br>LOS ANGELES CA 90025<br>(310)207-3233<br>rbwisner@wisnerbaum.com | **Aliases:** | *none* | |
| | | | | |
| 2 | 1 | | PLAINTIFF | MARTIN III, CHARLES E |
| **Address:** | 163 BLACKMAN ROAD<br>EGG HARBOR TOWNSHIP NJ 08234 | **Aliases:** | *none* | |
| | | | | |
| 3 | | | DEFENDANT | GERBER PRODUCTS COMPANY |
| **Address:** | 1812 N. MOORE STREET<br>ARLINGTON VA 22209 | **Aliases:** | *none* | |
| | | | | |
| 4 | | | DEFENDANT | NESTLE USA INC |
| **Address:** | 1812 N. MOORE STREET<br>ARLINGTON VA 22209 | **Aliases:** | *none* | |
| | | | | |
| 5 | | | DEFENDANT | WALMART INC |
| **Address:** | 702 S.W. 8TH STREET<br>BENTONVILLE AR 72716 | **Aliases:** | *none* | |
| | | | | |
| 6 | | | DEFENDANT | SHOP-RITE SUPERMARKETS INC |
| **Address:** | 5000 RIVERSIDE DRIVE<br>KEASBEY NJ 08832 | **Aliases:** | *none* | |
| | | | | |
| 7 | | | DEFENDANT | WAKEFERN FOOD CORPORATION |
| **Address:** | 5000 RIVERSIDE DRIVE<br>KEASBEY NJ 08832 | **Aliases:** | *none* | |
| | | | | |
| 8 | | | TEAM LEADER | BRIGHT, GWENDOLYN N |
| **Address:** | 1206 STOUT CENTER FOR C.J.<br>1301 FILBERT ST.<br>PHILADELPHIA PA 19107 | **Aliases:** | *none* | |

# Docket Entries

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 01-MAY-2026 01:27 PM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2605001635 | | |
| | | | |
| 01-MAY-2026 01:27 PM | COMMENCEMENT CIVIL ACTION JURY | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Final Cover | Add All to Cart | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 01-MAY-2026 01:27 PM | PRAE TO ISSUE WRIT OF SUMMONS | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Martin - PA Praecipe for Writ of Summons FINAL.pdf | Add All to Cart | |
| **Docket Entry:** | PRAECIPE TO ISSUE WRIT OF SUMMONS FILED. WRIT OF SUMMONS ISSUED. | | |
| | | | |
| 01-MAY-2026 01:27 PM | JURY TRIAL PERFECTED | WISNER, ROBERT BRENT | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 01-MAY-2026 01:27 PM | WAITING TO LIST CASE MGMT CONF | WISNER, ROBERT BRENT | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 29-MAY-2026 05:29 PM | PRAECIPE TO REISSUE SUMMONS | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Martin, Charles re-Issued Writ 2026-05-29.pdf | Add All to Cart | |
| **Docket Entry:** | PREACIPE TO REISSUE WRIT OF SUMMONS FILED. WRIT REISSUED. (FILED ON BEHALF OF CHARLES E MARTIN) | | |

| | | | |
|---|---|---|---|
| 29-JUN-2026 09:12 PM | PRAECIPE TO REISSUE SUMMONS | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents* 2026-06-29 - PA Praecipe for Reissuance of Writ.pdf | | Add All to Cart |
| **Docket Entry:** | PREACIPE TO REISSUE WRIT OF SUMMONS FILED. WRIT REISSUED. (FILED ON BEHALF OF CHARLES E MARTIN) | | |
| | | | |
| 14-JUL-2026 05:00 PM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 15-JUL-2026 07:36 AM | NOTICE GIVEN | | |
| **Docket Entry:** | OF CASE MANAGEMENT CONFERENCE SCHEDULED FOR 03-AUG-2026. | | |
| | | | |
| 28-JUL-2026 09:15 PM | PRAECIPE TO REISSUE SUMMONS | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents* 2026-07-28 - PA Praecipe for Reissuance of Writ - Charles Martin.pdf | | Add All to Cart |
| **Docket Entry:** | PREACIPE TO REISSUE WRIT OF SUMMONS FILED. WRIT REISSUED. (FILED ON BEHALF OF CHARLES E MARTIN) | | |
| | | | |
| 03-AUG-2026 02:47 PM | CASE RESCHEDULED BY COURT | FARBER, ARAM | |
| **Docket Entry:** | THE CASE MANAGEMENT ORDER ISSUANCE DATE IS CONTINUED; PLAINTIFF TO FILE COMPLAINT, EFFECT/DOCKET SERVICE AND E-FILE CASE MANAGEMENT MEMO. | | |
| | | | |
| 03-AUG-2026 02:51 PM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 04-AUG-2026 07:31 AM | NOTICE GIVEN | | |
| **Docket Entry:** | OF CASE MANAGEMENT CONFERENCE SCHEDULED FOR 03-SEP-2026. | | |
| | | | |
| 03-SEP-2026 10:39 AM | PLF CONTINUANCE REQ APPROVED | GIAMPAOLO, ANTHONY | |
| **Docket Entry:** | COMPLAINT TO BE FILED OR RISK SANCTIONS | | |

| | | | |
|---|---|---|---|
| 03-SEP-2026 10:39 AM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| 04-SEP-2026 07:31 AM | NOTICE GIVEN | | |
| **Docket Entry:** | OF CASE MANAGEMENT CONFERENCE SCHEDULED FOR 06-OCT-2026. | | |
| 16-SEP-2026 03:26 PM | AFFIDAVIT OF SERVICE FILED | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>260500152 - PA - Gerber Products Company - POS.pdf<br>260500152 - PA - Nestle - POS.pdf<br>260500152 - PA - Shop-Rite Supermarkets, Inc. - POS.pdf<br>260500152 - PA - Wakefern Food Corp. - POS.pdf<br>260500152 - PA - Walmart - POS.pdf | Add All to Cart | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S WRIT OF SUMMONS UPON WALMART INC, WAKEFERN FOOD CORPORATION, SHOP-RITE SUPERMARKETS INC, NESTLE USA INC AND GERBER PRODUCTS COMPANY BY PERSONAL SERVICE ON 08/04/2026 FILED. (FILED ON BEHALF OF CHARLES E MARTIN) | | |
| 05-OCT-2026 08:06 PM | COMPLAINT FILED NOTICE GIVEN | WISNER, ROBERT BRENT | |
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>2026-10-05 COMPLAINT (Martin, Charles III).pdf | Add All to Cart | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. (FILED ON BEHALF OF CHARLES E MARTIN) | | |
| 06-OCT-2026 07:23 AM | CASE RESCHEDULED BY COURT | LAWLOR, BRIAN | |
| **Docket Entry:** | APLF TO FILE COMPLAINT. | | |
| 06-OCT-2026 07:25 AM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| 07-OCT-2026 07:34 AM | NOTICE GIVEN | | |
| **Docket Entry:** | OF CASE MANAGEMENT CONFERENCE SCHEDULED FOR 30-NOV-2026. | | |

^ Go to Top

Philadelphia Courts

Questions regarding cases listed on this site can be directed to the Trial Division - Civil Administration at civiladminsupport@courts.phila.gov and (215) 686-8326 or the Office of Judicial Records - Civil at OJRCivil@courts.phila.gov and (215) 686-6652.

User Accepts/Agrees to Disclaimer.